Jung Ja MALANDRIS, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC., Defendant.

Civ. A. No. 75 M 156.

United States District Court,
D. Colorado.

Oct. 19, 1977.

**544**

William R. Fishman and David H. Drennen, Denver, Colo., for plaintiff.

Donald K. Bain and John M. Kobayashi, Holme, Roberts & Owen, Denver, Colo., for defendant.

## MEMORANDUM AND ORDER

MATSCH, District Judge.

After a four day trial with sharply conflicting testimony and upon instructions that liability could be found for fraud and deceit and for the intentional infliction of emotional distress, a jury of six persons returned a verdict for the plaintiff for $1,030,000.00 in compensatory damages and $3,000,000.00 in punitive damages. The defendant seeks a judgment notwithstanding the verdict or, alternatively, a new trial. A proper consideration of these motions requires some comment on the evidence.

The plaintiff, Jung Ja Malandris, is a naturalized citizen of the United States who was born and raised in the Republic of Korea. She has had no formal education of any kind and she is unable to read or write in any language. The plaintiff married Steven Malandris when he was on active duty as a truck driver in the United States Army in Korea.

After discharge, Mr. Malandris obtained employment as a baggage handler for United Airlines working first in New Jersey and later at Stapleton International Airport in Denver, Colorado. Recognizing that as an uneducated and unskilled worker his earning capacity is entirely dependent upon his physical strength, Steven Malandris has relentlessly worked double shifts and all of the overtime and holiday time which he could obtain from his employer.

Steven and Jung Ja Malandris have pursued an extraordinary life style, wholly dominated by a search for financial security. Although their income has been maximized, Mr. and Mrs. Malandris have avoided most of the expenditures ordinarily incurred by other couples in comparable circumstances. They have not gone to restaurants or movies; they have not subscribed to magazines or newspapers; they have not visited in the homes of others or had guests

in their apartment; and they have lived at a subsistence level. In sum, Mr. and Mrs. Malandris have existed in an isolated environment wholly separate from the society surrounding them.

Steven's hard work and their unusual life style enabled Mr. and Mrs. Malandris to accumulate more than $60,000.00 and, as a result of a posting of the price and income record of United Airlines stock on an employees' bulletin board, they invested all of their savings in United's common stock.

Jung Ja Malandris was the dominant marriage partner and, although Steven earned it, she controlled the couple's money. In this way, she also controlled her husband.

■ When the plaintiff became disquieted and uncomfortable about the future of United Airlines stock, she directed her husband to sell it and to put the proceeds into bank deposits. Mr. Malandris went to Merrill Lynch for that purpose and there he met Mr. John Barron, an account executive who was a retired army officer. While the testimony of Steven Malandris and John Barron sharply conflicts in most important respects, taken as a whole the evidence supports the version of Mr. Malandris. He said that John Barron induced him to leave the proceeds of the United Airlines sale with Merrill Lynch because the firm could make money for him just as banks made income from the investment of funds placed on deposit. Steven Malandris testified that John Barron said that there would be a "partnership" with Merrill Lynch with an assured gain and no possibility of any loss. The plaintiff's husband also said that he was induced to mislead his wife and to forge her signature on a power of attorney by the representations and later the threats of John Barron. What remains undisputed is that a margin account was opened in the name of Jung Ja Malandris and that a number of transactions were made on the Chicago Board of Options Exchange for this account. The account was closed with a loss of approximately $30,000.00.

The conflicting testimony of John Barron was that Steven Malandris came to him and directed him not only to sell the United Airlines stock, but also instructed him to open a margin account in his wife's name and, after computing the margin requirement without assistance, gave specific directions for each of his options trades.

After viewing the demeanor and manner of these two witnesses while they testified during the trial and after consideration of the other evidence in the case, including the documents in evidence and the unexplained absence of some of the routine documentation, I join the jury in rejecting the testimony of John Barron as lacking credibility. The evidence fully supports the finding that John Barron knew that he was dealing with a man and his wife who were wholly innocent of the risks involved in the securities market; that he knew of the extraordinary efforts to achieve the life savings brought to him; that he knew that the airlines stock was in the name of the plaintiff and that Mr. Malandris had delivered all of his earnings to his wife; that he deliberately manipulated Steven Malandris to deceive his wife and to conceal from her the investments which were made; that he knew Jung Ja Malandris was a Korean from a background of poverty and deprivation to whom financial security was of great importance; that he knew of the extraordinary life style which this couple followed; and, finally, that he, Barron, had no previous experience with options trading.

■ The evidence also shows, beyond doubt, that Jung Ja Malandris has sustained permanent emotional injury which has destroyed her ability to function as a human being. She has rejected this world and lives only in the anticipation of life after death. This results in her total preoccupation with religion.

■ The defendant urges that the verdicts be set aside because they are "so grossly excessive as to shock the judicial conscience." What is most relevant in this case is not the judicial conscience, it is the conscience of the community as represented by the six people who served on this trial jury. They heard this evidence and they

considered whether the conduct of John Barron went beyond the bounds of decency and was utterly intolerable in a civilized community. The defendant's counsel wish to make much of the fact that there was only a $30,000.00 economic loss. They, like their client, fail to understand that such economic losses can and do result in human suffering which cannot be evaluated arithmetically. This is not a case of a lost investment, it is the tragedy of a lost life. Is $1,000,000.00 too great a value to place upon that life?

■■ The defendant denies that there is any showing of proximate causation between its acts and plaintiff's emotional state. The jury was correctly instructed as follows:

> Proximate cause means that cause which in natural and probable sequence produced the claimed injury. It is the cause without which the claimed injury would not have been sustained. *See* C.J.I. § 9:24

The evidence shows that Jung Ja Malandris did have a predisposition to suffer severe emotional injury from any economic loss and the psychiatric testimony that she was greatly affected by the loss of control of her husband is an important aspect in this case. That loss of control was a consequence of the defendant's interference in this couple's relationship. It is apparent to me, as it must have been to the jury, that, knowing that which he did know about the plaintiff, John Barron should be held to know that a reasonably foreseeable consequence of the manipulation of Steven Malandris and the deceit of his wife would be the collapse of her ability to function. The defense has pointed out that there were other factors contributing to plaintiff's emotional condition. Yet, it failed to produce any evidence which would separate the effects of its wrongful conduct from the effects of other influences. The law in Colorado is clear that the aggravation of a pre-existing condition can result in liability if the wrongdoer is unable to isolate the impact. *Stephens v. Koch,* Colo., 561 P.2d 333 (1977); *Intermill v. Heumesser,* 154 Colo. 496, 391 P.2d 684 (1964).

■ The defendant contends that punitive damages are not allowable in this case. On this issue the jury was instructed that such damages could be considered only if the plaintiff had proven beyond a reasonable doubt that the the injury was attended by circumstances of fraud, malice, insult or a wanton and reckless disregard of the rights and feelings of the plaintiff. Again, I join the jury in the view that the evidence was sufficient to make such a finding and the amount of the damages imposed as a sanction against the defendant bears a reasonable relationship to the amount of the compensatory damages in the verdict. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365 (10th Cir. 1977).

To say, as defendant argues, that the corporate defendant cannot be sanctioned for the misconduct of its employee in this case is to ignore the evidence that the sales manager and office manager of the Denver office of Merrill Lynch approved and participated in that misconduct and failed to exercise proper care in selecting and supervising this salesperson. The jury was properly instructed and there is sufficient evidence to support the verdict for punitive damages.

■ During the third day of trial on Thursday, September 15, 1977 at approximately 4:30 P.M. while plaintiff's counsel was questioning John Barron on cross examination, Jung Ja Malandris, seated in the public area of the courtroom, began to cry uncontrollably. As her counsel was helping her from the courtroom and while the jury was leaving under the Court's instructions, Steven Malandris also lost control of his emotions and began shouting. The record is not clear as to what the jury may have heard and seen at that time, but the jury was returned and given a cautionary instruction when the trial resumed at 4:45 P.M. Mr. and Mrs. Malandris were not then present. The trial continued on Friday, September 16, 1977, without either Mr. or Mrs. Malandris being present. The case was given to the jury on the following Monday, September 19, 1977. The intervening day of testimony and weekend be-

tween the Malandris' conduct and closing arguments and submission to the jury must be considered in evaluating any effect of this unfortunate incident on the jury's deliberation. Additionally, the conduct of Mr. and Mrs. Malandris must be viewed in the context of the trial. There is nothing to indicate that either of these people engaged in any theatrics or that they deliberately attempted to use this as a means to communicate with the jury. Having observed the entire trial, including the incident in question, it is my finding and conclusion that these outbursts were genuine human responses to testimony which was not credible and which went directly to the pivotal issues in the case. Mrs. Malandris' actions were entirely consistent with the testimony of both psychiatrists. Mr. Malandris' reaction to the testimony of Mr. Barron can best be characterized as instinctive, uncontrolled anger. It is not possible to try lawsuits in a sterile chamber, wholly free from the effects of human emotions, particularly in a case in which the injury complained of is severe emotional distress. The prejudice to the defendant in this case from the emotional outburst by the plaintiff is no greater than a plaintiff's display of disfigured or dismembered parts of his body on a claim for physical injury. *See* S. Gard, *Jones on Evidence* § 15:4 at 10 (6th ed. 1972).

Considering the evidence as a whole, in my judgment, this jury verdict was produced not by any passion, prejudice or sympathy generated by the plaintiff's conduct or that of her husband; it was, rather, the product of a sense of outrage and indignation about the callous and cavalier conduct of the defendant's agent acting in complete disregard of the rights and sensitivities of the plaintiff whose emotional and economic security was in his hands.

The defendant also claims that it was error to exclude the testimony of its witness, Jeavons, concerning the options trading. Such testimony was irrelevant and prejudicial. The facility with which one who is truly expert in a specialized aspect of securities trading might be able to explain and simplify it to a jury would, in my judgment, mislead and misdirect the jury as to the issues in the case. What was important was what Mr. Malandris and Mr. Barron knew and said to each other about such activity.

The constitutional right of trial by jury is nothing less than the right to have human conflict resolved by the considered judgment of representative members of the community. Any interference with such a community judgment must be justified by compelling circumstances showing unfairness in the manner in which the issue was presented or considered. In evaluating a motion to set aside a jury verdict, it must be remembered that the Seventh Amendment of the United States Constitution specifically preserved the right of trial by jury as it existed in the common law courts of England. I am aware of no better exposition of that right than these words of Sir William Blackstone:

> . . . in settling and adjusting a question of fact, when intrusted to any single magistrate, partiality and injustice have an ample field to range in; either by boldly asserting that to be proved which is not so, or by more artfully suppressing some circumstances, stretching and warping others, and distinguishing away the remainder. Here, therefore, a competent number of sensible and upright jurymen, chosen by lot from among those of the middle rank, will be found the best investigators of truth, and the surest guardians of public justice. For the most powerful individual in the state will be cautious of committing any flagrant invasion of another's right, when he knows that the fact of his oppression must be examined and decided by twelve indifferent men, not appointed till the hour of trial; and that, when once the fact is ascertained, the law must of course redress it. This, therefore, preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens.

*Commentaries on the Laws of England, Vol. III,* Adaptation by John L. Wendell, (Harper & Bros., N.Y., 1854).

I have reflected carefully on this trial and the results achieved and in my view the trial was fair and the verdict was within the discretion of the people who sat on this jury. Accordingly, it is

ORDERED that the defendant's motions for judgment notwithstanding the verdict and for a new trial are denied.