Isabel Morel de LETELIER et al., Plaintiffs,

v.

The REPUBLIC OF CHILE et al., Defendants.

Civ. A. No. 78–1477.

United States District Court, District of Columbia.

Nov. 5, 1980.

Michael E. Tigar, Samuel J. Buffone, Lynne Bernabei, Tigar & Buffone, P. C., Washington, D. C., for plaintiffs.

William J. Garber, Washington, D. C., for Ignacio Novo Sampol.

Barry W. Levine, Washington, D. C., for Michael Townley for limited purpose of issue of contempt.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This action is before the Court for a final determination relevant to the attempt of plaintiffs Isabel, Christian, Jose, Francisco, and Juan Pablo Letelier, and Michael Maggio, respectively the widow, sons, and personal representative of Orlando Letelier, and Michael Moffitt and Murray and Hilda Karpen, respectively the widower–personal representative and the parents of Ronni Karpen Moffitt, to obtain judgments by default against defendants Republic of Chile, Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin

Ross Diaz, Guillermo Novo Sampol, and Ignacio Novo Sampol, for their alleged culpability for the bombing deaths of former Chilean ambassador Letelier and Ronni Moffitt in September 1976 in Washington, D.C. After careful consideration of the entire record of this case, including the testimony and documentary evidence presented at the June 20, 1980 hearing regarding several of the pending applications for judgments by default, it is apparent plaintiffs have established their right to relief as against all but one of these defendants and thus are entitled to judgments by default in the amounts hereinafter set forth.

Plaintiffs, either citizens of the states of Maryland or New Jersey, or of the District of Columbia, or of the Republic of Chile, brought this suit asserting various tortious causes of action [1] and seeking recompense, pursuant to those statutory enactments governing the survival of actions, D.C.Code § 12--101 (Supp. VII 1980), and wrongful death, id. § 16–2701 (1973), from those they alleged were involved in the deaths of Orlando Letelier and Ronni Moffitt, both of whom died as a result of the detonation of an explosive device under the driver's seat of Orlando Letelier's automobile as it rounded Sheridan Circle, N.W., in the District of Columbia on September 21, 1976. The named defendants to the action are either a foreign state, or citizens of a foreign state, or citizens of a state other than the states of Maryland or New Jersey or of the District of Columbia.

Filed on August 23, 1978, the first amended complaint in this action was served by Deputy United States Marshals upon Alvin Ross Diaz (Ross), Guillermo Novo Sampol (Guillermo Novo), and Ignacio Novo Sampol (Ignacio Novo) on August 23, 1978, and on defendant Michael Vernon Townley two days later. Service was attempted upon defendants Juan Manuel

---

1. In this complaint plaintiffs have asserted the following causes of action: 1) conspiracy to deprive Orlando Letelier and Ronni Moffitt of their constitutional rights in violation of 42 U.S.C. § 1985 (1976); 2) assault and battery; 3) negligent transportation and detonation of explosives; 4) tortious activities in violation of

the law of nations resulting in death to Orlando Letelier and Ronni Moffitt; and 5) tortious assault upon Orlando Letelier, an internationally protected person pursuant to 18 U.S.C. § 1116 (1976), that was the proximate cause of his death and the death of Ronni Moffitt.

Contreras Sepulveda (Contreras), Pedro Espinoza Bravo (Espinoza), and Armando Fernandez Larios (Fernandez) in Chile by registered mail, return receipt requested, pursuant to Federal Rule of Civil Procedure 4(i)(1)(D). On September 7, 1978, the return receipts were filed with the Court upon which it was indicated that copies of the first amended complaint were received on behalf of defendants Contreras, Espinoza, and Fernandez on August 29, 1978. Upon their failure to answer, defaults were taken against defendants Townley, Ross, and Ignacio Novo on September 20, 1978, while a default was entered against defendant Guillermo Novo on October 24, 1978.

As to defendant Republic of Chile, it was served with the first amended complaint on November 17, 1978, pursuant to the procedures set forth at 28 U.S.C. § 1608(a)(4). Upon its failure to answer, a default was entered against the Chilean Republic by the Honorable John H. Pratt on May 2, 1979. Because questions were raised about the subject matter jurisdiction of the Court to entertain this suit against the Republic of Chile under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1601–1610 (1976), after receiving a memorandum on that subject from plaintiffs on March 11, 1980, a memorandum opinion was filed in

which it was held that such jurisdiction did indeed lie. *Letelier v. Republic of Chile*, 488 F.Supp. 665 (D.D.C.1980).

In June 1980, a hearing was held at which plaintiffs were afforded an opportunity to satisfy the Court that judgments by default should be granted in their favor and against the Republic of Chile, pursuant to 28 U.S.C. § 1608(e) (1976), and individual defendants Townley, Ross, Guillermo Novo, and Ignacio Novo, pursuant to Federal Rule of Civil Procedure 55(b)(2). Subsequently, on September 22, 1980, service of the first amended complaint was again obtained upon defendants Contreras and Fernandez in Chile, this time by letters rogatory in accord with Rule 4(i)(1)(B). Defaults then were taken against defendants Contreras, Espinoza, and Fernandez on October 23, 1980, making this action ripe for disposition as to all defendants.[2]

In seeking to establish their claims to relief relating to the tragic deaths of Orlando Letelier and Ronni Moffitt, the evidence presented by plaintiffs which details the bombing incident is, in the main, derived from the testimony of defendant Michael Vernon Townley under oath at the criminal trial of defendants Ross, Ignacio Novo, and Guillermo Novo in January 1979.[3] As relat-

**2.** Also named as defendants in the first amended complaint to this action were the Centro Nacional de Informaciones (CNI) (formerly Direccion de Intelligencia Nacionale (DINA)), Virgilio Paz Romero, Jose Dionisio Suarez Esquivel, and John Does One through Ten. For various reasons and with plaintiffs' acquiescence all of these defendants have been dismissed from this action, without prejudice.

**3.** Following a five–week trial by jury in early 1979, defendants Ross and Guillermo Novo were convicted of various charges relating to the deaths of Orlando Letelier and Ronni Moffitt, including first degree murder, D.C.Code § 22–2401 (1973), murder of a foreign official, 18 U.S.C. §§ 1111, 1116 (1976), and conspiracy to murder a foreign official, *id.* § 1117, while Ignacio Novo was convicted of making false declarations to the grand jury, *id.* § 1623, and misprison of a felony, *id.* § 4. All three were sentenced to substantial prison terms. Recently, however, the convictions of all three defendants were overturned by the United States Court of Appeals for the District of Columbia Circuit. *United States v. Sampol*, 636 F.2d 621

(D.C.Cir. 1980). The convictions of Ross and Guillermo Novo were reversed because of the introduction of the testimony of government informants who were inmates in the same cellblocks with Guillermo Novo and Ross while they were imprisoned awaiting trial, *id.* at 630 642; Ignacio Novo's conviction was reversed because of the failure of the trial court to grant him a separate trial on the charges against him, *id.* at 642 651.

As evidence in support of their applications for default judgments, the plaintiffs introduced approximately 160 exhibits, many of which were copies of exhibits introduced at the trial of the Novos and Ross, but none of these were related to the matters cited by the Court of Appeals as compelling the reversal of the three convictions. Also introduced were copies of the sworn testimony of defendant Michael Vernon Townley given at the criminal trial. Although defendant Townley currently is serving a criminal sentence for his involvement in the Letelier and Moffitt killings at an undisclosed location under the aegis of the United States Marshals' Witness Protection Program, be-

ed by Townley, an American citizen and a long–time Chilean resident, he first became involved in the events that culminated in the Letelier and Moffitt killings sometime in late June or early July 1976. At that time he was contacted by defendant Armando Fernandez Larios, then a lieutenant in the Chilean Army and an operative of the Chilean intelligence service, the Direccion de Intelligencia Nacionale (DINA) (now known as the Centro Nacionale de Informaciones (CNI)), to arrange a meeting between Townley, then a civilian contract employee of DINA, and defendant Pedro Espinoza Bravo, then a lieutenant colonel in the Chilean Army and Director of Operations of DINA. At the meeting, Colonel Espinoza asked Townley whether he would be available for a special DINA operation outside Chile in the near future. Townley indicated that while he was reluctant to leave the country because of his wife's health, he would undertake such a mission if ordered to do so. At another meeting several weeks later, Espinoza informed Townley that the mission would involve travel to the United States for the purpose of assassinating Orlando Letelier. Entry into the United States, according to Espinoza, was to be accomplished with Paraguayan documents and, to the extent necessary, Fernandez and Townley were to use members of the anti–Castro Cuban exile group, the Cuban Nationalist Movement (CNM), to accomplish the murder.

In July 1976, Fernandez and Townley went to Paraguay, via Argentina, and, with the help of Paraguayan authorities, obtained Paraguayan passports under assumed names which, in turn, they used to obtain visas to the United States. Because of the apparent uneasiness of DINA officials in Chile over the nearly two weeks it took to obtain the passports and visas, the trip of Fernandez and Townley to the United States using those documents was cancelled and they were ordered to return to Chile, which they did.

In August 1976, Espinoza again contacted Townley to inform him that the Letelier mission was still scheduled and that Fernandez was already in the United States surveilling Letelier to record his movements and daily patterns. Townley was instructed, as he had been in the earlier meetings, to make the killing appear accidental or a suicide if possible, but that other means, including an explosive or a shooting, could be utilized to eliminate Letelier. Townley also was told that he was to be out of the United States before the assassination took place.

Townley departed Santiago, Chile, on September 8, 1976, and arrived at New York's John F. Kennedy International Airport on September 9, traveling under the assumed name of Hans Peterson Silva. Uncontradicted testimony demonstrated that facilities and personnel of LAN Chile Airlines, a foreign air carrier owned and operated by the government of Chile, were used by Townley in connection with the preparation and carrying out of the assassination of Orlando Letelier and Ronni Moffitt. At Kennedy Airport he met Fernandez and was given a sketch of Letelier's residence and place of employment as well as written information describing the Leteliers' automobiles. Fernandez also gave Townley a verbal briefing on Letelier's daily movements. The two DINA agents then parted and Fernandez returned to Chile.

From Kennedy Airport Townley drove a rental car into New Jersey and checked into a hotel under the name of Hans Peterson. He made contact by telephone with CNM member Virgilio Paz Romero and scheduled

cause of the clear and present danger to Mr. Townley and to other persons that would have been precipitated by bringing him before the Court, he has been considered unavailable. Consequently his sworn testimony during the criminal proceedings instituted against the Novos and Ross, which was not in any way questioned by the Court of Appeals or involved as a basis for the reversal of the convictions, has been considered in determining the propriety of the entry of the judgments by default in this case. Fed.R.Evid. 804(a)(5). The testimony of the government informers that the Court of Appeals found to have been improperly admitted at the criminal trial has not been considered by this Court.

a supper meeting. At the dinner, Townley made further arrangements to meet with defendant Guillermo Novo Sampol, a CNM leader. On September 10, 1976, he met for lunch with Guillermo Novo and Jose Dionisio Suarez Esquivel. At this meeting, he outlined his DINA mission to assassinate Letelier and sought CNM's help. Guillermo Novo declined to commit CNM at that time. Subsequently, however, after another gathering at which the assassination plan was discussed in the presence of several individuals identified as directors of CNM, including Guillermo Novo, Suarez, and defendant Alvin Ross Diaz, Guillermo Novo and Suarez informed Townley that it had been decided that CNM would assist DINA in murdering Letelier. It was agreed that Paz and Townley would proceed to Washington, D.C., to conduct corroborative surveillance and that Suarez would join them several days later to assist in the assassination. It was also decided that the attempt would be made by installing a bomb under Letelier's automobile and detonating it with a remote control device.

On September 15, 1976, Townley went with Paz to the Union City, New Jersey, headquarters of CNM where they received from Guillermo Novo and Suarez a paging device modified for use as a remote control detonator and a shopping bag containing three kilograms of dynamite and one-half pound of plastic explosive. Paz and Townley then proceeded by car to Washington, arriving in the early morning hours of Thursday, September 16, 1976. Once in Washington, they first drove to the vicinity of Orlando Letelier's home to check that general area. They then registered in a motel in northwest Washington. The remainder of Thursday and all day on Friday, September 17, was spent verifying and supplementing the information supplied by Fernandez concerning Letelier's movements and habits; at one point they even trailed Letelier by car from his home to his office at the Institute for Policy Studies. On Friday they also went to a department store in upper northwest Washington and purchased two aluminum baking pans and several rolls of electrical tape to be used in building a

bomb and a pair of rubber gloves to avoid leaving fingerprints on their explosive handiwork. Suarez arrived from New Jersey on the morning of Saturday, September 18, 1976, to aid in the preparations, and after Paz and Townley moved to a different motel in northeast Washington across from Suarez's motel, the three made a shopping trip to an electronics store in downtown Washington where they purchased a battery pack and a set of tools to be used for constructing the bomb.

On the evening of Saturday, September 18, 1976, Townley built the bomb intended for the assassination attempt in the motel room he shared with Paz. Paz, Suarez, and Townley then drove to the Letelier house to place the bomb on Orlando Letelier's car. Although it was planned that Paz and Suarez were to take responsibility for detonation of the device on Monday, September 20, they insisted that Townley, as a DINA agent, attach it. After several false starts, Townley succeeded in planting the bomb beneath Letelier's car, which was parked in the driveway of the Letelier home.

On the morning of Sunday, September 19, 1976, Townley flew from Washington to Newark, New Jersey, and was met by defendant Ross. Over breakfast, Townley gave Ross the full details of his activities in Washington. Ross then drove Townley to Guillermo Novo's residence where Townley described for Novo his actions in Washington.

Later that same day, Townley went to Kennedy Airport to catch a flight to Miami, Florida. While there, he attempted to "fix" the records showing the entry of Hans Peterson Silva into the United States. This was done by surreptitiously mixing the Immigration and Naturalization Service's Form I-94, issued to Townley under the name of Silva upon his arrival in the United States, with a pile of I-94's collected from passengers departing for Spain on a Spanish airliner. Because his past experience indicated that the I-94's collected at ticket counters were turned over to immigration officials by airline personnel without any effort to check them against the passengers

listed in the flight manifest, Townley hoped in this way to insure that immigration records would show Silva left the country prior to any attempt to assassinate Letelier. Townley then took a flight from Kennedy Airport to Miami, arriving either in the late evening of September 19 or in the early morning hours of Monday, September 20, 1976.

On Monday, Townley went to visit his parents who lived in the Miami area and stayed until Tuesday, September 21, 1976. Having received no word of any assassination attempt, at approximately 7:00 a. m. on Tuesday morning Townley contacted Paz by telephone at his New Jersey residence for the purpose of ascertaining what had happened in Washington. Paz, however, was very curt, chiding Townley for using the telephone for sensitive conversations before immediately hanging up. Later that day, Townley contacted defendant Ignacio Novo Sampol, the brother of Guillermo Novo and a CNM member who lived in Miami, to arrange a meeting. Ignacio Novo advised Townley to listen to the radio because something big had happened in Washington. Later that day, at a meeting with Ignacio Novo, Townley described in detail his activities with Paz and Suarez in Washington.

Townley, traveling under the name Kenneth Enyart, returned to Chile on a Chilean airline flight that left Miami on the evening of Wednesday, September 22, 1976.

Within a few days after his return to Chile, Townley reported to Colonel Espinoza and briefed him on the results of the Letelier mission. Also shortly after the Letelier mission, Townley made a telephone call to Paz in the United States, who explained to Townley that the bomb had not been detonated on Monday, September 20, 1976, because of a malfunction and, as a consequence, CNM had removed the bomb from Letelier's car, fixed it, and then reinstalled it.

In early 1978, developments in the investigation of the Letelier assassination in the United States prompted Guillermo Novo, Virgilio Paz, and Alvin Ross to contact defendant Townley by telephone at different times to request a loan of $25,000 in order to relocate those CNM members they felt were under government scrutiny. Townley relayed this request to defendant General Manuel Contreras Sepulveda, who was director of DINA at the time of the assassination. Contreras indicated to Townley, however, that because he was no longer director of DINA, he did not have access to funds. Contreras and Townley also met in March 1978 to discuss covering up the trips of Townley and Fernandez to Paraguay to obtain passports and visas and to the United States to plan and execute the Letelier assassination. Contreras first suggested that Townley flee Chile to avoid questioning, but when this request was rejected, he suggested that Townley and Fernandez admit that they went to Paraguay on a national security mission, the nature of which they would refuse to disclose, and that neither had gone to the United States. Townley, Fernandez, and Contreras then met together and it was agreed, as to the Paraguay trip, that they would tell the truth about that trip, with the exception of its purpose as part of any plan to kill Letelier.

Finally, Townley testified that while he received his orders for the mission from Colonel Espinoza, ultimately only General Contreras, as director of DINA, could have authorized the undertaking of the mission outside of Chile and the issuance of the passport in the name of Hans Peterson Silva used by Townley to gain admittance to the United States.

Further detailing the events surrounding the Letelier assassination and corroborating Townley's sworn testimony were a number of witnesses and various exhibits offered by plaintiffs.

According to the testimony of plaintiff Isabel Letelier, following the election of Salvador Allende as president of Chile in 1970, Orlando Letelier served variously as Ambassador of the Republic of Chile in the United States, Minister of Foreign Relations, Minister of Interior, and finally Minister of Defense. When the military junta headed by General Augusto Pinochet came

to power in September 1973, Letelier was imprisoned until approximately February of 1974. At that time, he was expelled from Chile and after a stay in Venezuela made his way to the United States in January 1975. While in the United States, he served as Director of the Transnational Program at the Institute for Policy Studies in Washington, D.C. During 1975 and 1976 up until the time of his death, he not only worked at the Institute, but also taught at a local university and engaged in various political activities, which included speaking and writing in opposition to the Pinochet government.

As to the events of the day of September 21, 1976, plaintiff Michael Moffitt testified that because of trouble with their car, he and Ronni Moffitt were riding with Orlando Letelier that morning to the Institute where they were all employed. Orlando Letelier was driving, while Ronni Moffitt was in the front passenger seat and Michael Moffitt was in the rear behind his wife. As they rounded Sheridan Circle, an explosion erupted under the car, lifting it off the ground. When the car came to a halt, Michael Moffitt was able to escape from the rear end of the car by crawling out a back window. He saw his wife stumbling away from the car and assuming that she was all right, went to assist Letelier. He found Letelier still in the driver's seat, and despite the fact that much of his lower torso was blown away, Letelier's head was rolling back and forth, his eyes were moving slightly, and he attempted to mutter several things, which were unintelligible. Michael Moffitt tried to remove Letelier from the car but was unable to do so. He then noticed that his wife had disappeared from view and as the police began to arrive he left Letelier and went across the street where he found Ronni Moffitt lying on the ground, being attended to by a doctor who happened to be driving by at the time of the explosion. Ronni Moffitt was bleeding heavily from her mouth.

Both Ronni Moffitt and Orlando Letelier were taken to the hospital shortly thereafter. While Michael Moffitt estimated that the bomb was detonated at approximately 9:30 a.m., the reports of the Medical Examiner's office set the time of death of Orlando Letelier at 9:50 a.m. and the time of death of Ronni Moffitt at 10:37 a.m. The cause of death for both was listed as explosion–incurred injuries.

Finally, appearing on behalf of plaintiffs as an expert on Chilean law was Professor Eugenio Velasco, a former director of the School of Law at the National University of Chile who is now teaching at several American law schools following his exile from Chile in 1976. Testifying about the content and meaning of the statutory provisions that established DINA, Decree Law No. 521 of June 18, 1974, and Decree Law No. 527 of June 26, 1974, Professor Velasco declared that DINA, as characterized by article 1 of Decree Law No. 521, was a military organism that depended directly on the ruling military junta headed by President Augusto Pinochet. The relationship of DINA to the junta was more fully explained, according to Professor Velasco, by Decree Law No. 527, which placed DINA directly under President Pinochet by reason of its provisions granting Pinochet all executive power. Further, as it relates to the role of the Director General of DINA, who, until its dissolution in 1977, was Manuel Contreras Sepulveda, Professor Velasco found that Decree Law No. 521 placed upon the Director General responsibility for and direct control of the most important functions of DINA. As to the status of DINA's successor, the Centro Nacionale de Informaciones, by Decree Law No. 1878 of August 12, 1977, it was established as the legal successor to DINA and took over all of DINA's assets, liabilities, responsibilities, and rights. Finally, Professor Velasco testified that on the basis of the statutory attributes given DINA and the director general, only General Contreras could have ordered the assassination of Orlando Letelier.

From the various filings of the plaintiffs and the totality of the evidence presented to the Court, the following legal conclusions are in order:

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330, 1331, 1332(a)(3), 1343(1)–(2), 1350 and the doctrines of pendent and ancillary jurisdiction.

■ 2. Pursuant to the dictates of 28 U.S.C. § 1608(e), plaintiffs have produced satisfactory evidence to establish that on or about September 21, 1976, employees of the Republic of Chile, acting within the scope of their employment and at the direction of Chilean officials who were acting within the scope of their office, committed tortious acts of assault and battery and negligent transportation and detonation of explosives that were the proximate cause of the deaths of Orlando Letelier and Ronni Moffitt. Accordingly, a judgment by default as to these claims will be entered in favor of plaintiffs and against the Republic of Chile.

3. The issuance of a judgment by default against defendants Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol is proper as to plaintiffs' claims of conspiracy to deprive Orlando Letelier and Ronni Moffitt of their constitutional rights in violation of 42 U.S.C. § 1985, assault and battery, negligent transportation and detonation of explosives, tortious actions in violation of international law, and tortious assault upon Orlando Letelier, an internationally protected person pursuant to 18 U.S.C. § 1116, which was the proximate cause of the deaths of Letelier and Ronni Moffitt.[4]

Plaintiffs have established their rights to relief by evidence satisfactory to the Court.

■ Judgments by default being proper, damages will be assessed against the defendants. Suit was instituted in this instance under both the District of Columbia statute governing survival of actions, D.C. Code § 12–101 (Supp. VII 1980), and the legislative enactment allowing wrongful death actions, id. § 16–2701 (1973). On the basis of the evidence presented on June 20, 1980, as to the pain and suffering of Orlando Letelier and Ronni Moffitt as well as their estimated life values, that is, the loss of support resulting from their deaths, the following allocation of damages is made:[5]

I. With respect to Orlando Letelier: a) under the survival statute, D.C.Code § 12–101, and 28 U.S.C. § 1606, 1) judgment will be entered in favor of plaintiffs Isabel, Christian, Jose, Francisco, and Juan Pablo Letelier and against defendants Republic of Chile, Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol, jointly and severally, in the amount of $30,000 to compensate for pain and suffering; and 2) judgment will be entered in favor of plaintiffs Isabel, Christian, Jose, Francisco, and Juan Pablo Letelier and against defendants Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol, jointly and severally, in the amount of $1,000,000 as an award of punitive damages; and b) under the wrongful death statute, D.C.Code § 16–2701 and 28 U.S.C. § 1606, judgment will be entered in favor of plaintiff Michael Maggio, as the personal representative of Orlando Letelier, and

4. Although plaintiffs have sought a default judgment against defendant Ignacio Novo Sampol as well, it is apparent from the evidence presented to the Court that his knowledge of and involvement in the murders occurred only after they had been accomplished, making any finding of civil liability inappropriate as it relates to Ignacio Novo. Accordingly, the Court will vacate the default entered against that defendant and dismiss him from this action.

5. Although the June 20, 1980, hearing at which evidence relevant to damages was presented by plaintiffs was before the entry of defaults

against defendants Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, and Armando Fernandez Larios, they have been sued in this action as joint tortfeasors along with the other parties against whom defaults were pending on June 20, 1980. Plaintiffs have requested that the evidence adduced at that June hearing be applied to the question of damages against Contreras, Espinoza, and Fernandez and will be so considered without holding a separate, duplicative hearing. See Order of October 23, 1980.

against defendants Republic of Chile, Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol, jointly and severally, in the amount of $1,526,479.

II. With respect to Ronni Karpen Moffitt: a) under the survival statute, D.C. Code § 12–101 and 28 U.S.C. § 1606, 1) the judgment will be entered in favor of plaintiffs Michael Moffitt and Hilda and Murray Karpen and against defendants the Republic of Chile, Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol, jointly and severally, in the amount of $80,000 to compensate for pain and suffering; and 2) judgment will be entered in favor of plaintiffs Michael Moffitt and Hilda and Murray Karpen and against Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol, jointly and severally, in the amount of $1,000,000 as an award of punitive damages; and b) under the wrongful death statute, D.C.Code § 16–2701 and 28 U.S.C. § 1606, judgment is entered in favor of plaintiff Michael Moffitt, as the personal representative of Ronni Karpen Moffitt, and against defendants Republic of Chile, Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol, jointly and severally, in the amount of $916,096.

Unquestionably, there has been grave loss to Michael Moffitt, the widower of Ronni Moffitt, who has also sued the defendants in his individual capacity.. Not only was he the other passenger in the vehicle in which the assassinations occurred, but his testimony vividly described the ordeal to his own physical and emotional person as a proximate result of the events of September 21, 1976, including subsequent psychiatric therapy. Nonetheless, no judgment for damages can be entered in his favor other than as to pain and suffering

since the record is barren as to any specific information concerning the psychiatric therapy other than vague references thereto. The expenses accordingly incurred and expected to incur in the future, if at all, are only speculative. As to his pain and suffering, proximately resulting from the defendants' acts, judgment will be entered in favor of the plaintiff, Michael Moffitt, individually and against defendants Republic of Chile, Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol, jointly and severally, in the amount of $400,000.

Counsel for plaintiffs have moved the Court for an award of attorneys' fees and expenses noting by affidavit the hourly investments and rates of the five attorneys who have prepared, filed and litigated this action, as well as the out–of–pocket expenses actually incurred in connection with this cause for which reimbursement is sought.

The lawsuit has involved intricate proceedings, reliance on a relatively new statute devoid of interpretation relevant to the instant matter, proposed default against a foreign nation, and studied application to international document exchange. The unique and complex investigation/research, conducted necessarily in an atmosphere charged with special sensitivity to diplomatic mores, unceasingly intensified the tragic circumstances compelling this litigation.

The 1,417 hours were logged primarily by associates of the firm with varying degrees of experience and the firm itself has, in concert with *Copeland v. Marshall*, No. 77–1351 (D.C.Cir. Sept. 2, 1980) (en banc) discounted their hours by twenty percent to offset "learning" experience and to reflect, accordingly, 1,233.75 hours invested in these proceedings.

The zealous application of counsel who were unswervingly committed to their compassionate pursuit on behalf of the plaintiffs must be commended highly. They exhibited substantial legal skills in this novel litigation, slicing through obfuscation to

achieve a conclusion of substantial benefit to their clients. An award of compensable and reasonable counsel fees in such a situation is not only appropriate but mandated. It is of interest to note that plaintiffs' counsel, who devote a substantial amount of their time to *pro bono publico* matters, will assign any judgment for attorneys' fees to the Letelier–Moffitt Human Rights Fund, a non–profit organization.

Accordingly, pursuant to 42 U.S.C. § 1988, defendants Juan Manuel Contreras Sepulveda, Pedro Espinoza Bravo, Armando Fernandez Larios, Michael Vernon Townley, Alvin Ross Diaz, and Guillermo Novo Sampol are held liable jointly and severally for the fees and expenses of plaintiffs' counsel in the amounts of $100,000.00 for counsel fees and $10,279.97 for reimbursement of expenses.