Dolly M.E. FILARTIGA and Joel
Filartiga, Plaintiffs,

v.

Americo Norberto PENA–IRALA,
Defendant.

No. 79 C 917.

United States District Court,
E.D. New York.

Jan. 10, 1984.

Center for Constitutional Rights, New York City (Peter Weiss, Rhonda Copelon, Betty Lawrence Bailey, New York City of counsel), Michael Maggio, Washington, D.C., for plaintiffs.

Steven M. Schneebaum, Washington, D.C., for amicus curiae Intern. Human Rights Law Group.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs, Dolly M.E. and Dr. Joel Filartiga, citizens of Paraguay, brought this action against defendant Pena, also a Paraguayan citizen, and the former Inspector General of Police of Asuncion. They alleged that Pena tortured and murdered Joelito Filartiga, the seventeen year old brother and son, respectively, of plaintiffs, in retaliation for Dr. Filartiga's opposition to President Alfredo Stroessner's government. Plaintiffs invoked jurisdiction under, among other provisions, 28 U.S.C. § 1350, giving the district court "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

This court followed what it deemed the binding precedents of *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir.1975) and *Dreyfus v. von Finck*, 534 F.2d 24 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976), and dismissed for lack of jurisdiction on the ground that violations of the law of nations "do not occur when the aggrieved parties are nationals of the acting state," *id.* at 31.

The Court of Appeals reversed and remanded, concluding that the above quoted language from the *Dreyfus* opinion was "clearly out of tune with the current usage and practice of international law." *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir.1980). The Court of Appeals held that "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties," and that 28 U.S.C. § 1350 gave jurisdiction over an action asserting such a tort committed in violation of the law of nations. *Id.* at 878.

Following remand Pena took no further part in the action. This court granted a default and referred the question of damages to Magistrate John L. Caden for a report. The Magistrate, after a hearing, recommended damages of $200,000 for Dr.

Joel Filartiga and $175,000 for Dolly Filartiga. Plaintiffs filed objections to the report, and the matter is now here for determination.

## I

■ Before addressing damages the court considers two matters urged before but not decided by the Court of Appeals. Both go to whether the court should decline to exercise jurisdiction.

The first is whether the court should abstain in deference to the so-called act of state doctrine. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Were the government of Paraguay concerned that a judgment by the court as to the propriety of Pena's conduct would so offend that government as to affect adversely its relations with the United States, presumably Paraguay would have had the means so to advise the court.

In any event, the Court of Appeals held that the alleged acts constitute, by the "general assent of civilized nations," a "clear and unambiguous" violation of the law of nations. 630 F.2d at 881, 884. As the Supreme Court noted in discussing the act of state doctrine in the *Sabbatino* decision, "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it." 376 U.S. at 428, 84 S.Ct. at 940. Where the principle of international law is as clear and universal as the Court of Appeals has found it to be, there is no reason to suppose that this court's assumption of jurisdiction would give justifiable offense to Paraguay.

Moreover, as the Court of Appeals noted, Paraguay has not ratified Pena's acts, 630 F.2d at 889, and this alone is sufficient to show that they were not acts of state. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 684, 694, 96 S.Ct. 1854, 1856, 1861, 48 L.Ed.2d 301 (1976).

■ Pena argued here on the original motion and in the Court of Appeals that this court should decline to proceed because Paraguay and not the United States is the convenient forum. Pena's default now casts doubt on the good faith of this contention. Its merits depend on whether the courts of Paraguay are not only more convenient than this court but as available and prepared to do justice. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 265 n. 22, 70 L.Ed.2d 419 (1981). Pena submitted nothing to cast doubt on plaintiffs' evidence showing that further resort to Paraguayan courts would be futile. This court will therefore retain jurisdiction.

## II

■ The Court of Appeals decided only that Section 1350 gave jurisdiction. We must now face the issue left open by the Court of Appeals, namely, the nature of the "action" over which the section affords jurisdiction. Does the "tort" to which the statute refers mean a wrong "in violation of the law of nations" or merely a wrong actionable under the law of the appropriate sovereign state? The latter construction would make the violation of international law pertinent only to afford jurisdiction. The court would then, in accordance with traditional conflict of laws principles, apply the substantive law of Paraguay. If the "tort" to which the statute refers is the violation of international law, the court must look to that body of law to determine what substantive principles to apply.

The word "tort" has historically meant simply "wrong" or "the opposite of right," so-called, according to Lord Coke, because it is "wrested" or "crooked," being contrary to that which is "right" and "straight". Sir Edward Coke on Littleton 158b; *see also* W. Prosser, Law of Torts 2 (1971). There was nothing about the contemporary usage of the word in 1789, when Section 1350 was adopted, to suggest that it should be read to encompass wrongs defined as such by a national state but not by international law. Even before the adoption of the Constitution piracy was defined as a crime by the law of nations.

*United States v. Smith,* 18 U.S. (5 Wheat.) 153, 157, 5 L.Ed. 57 (1820). As late as 1819 Congress passed legislation, now 18 U.S.C. § 1651, providing for punishment of "the crime of piracy, as defined by the law of nations." 3 Stat. 510 (1819). Congress would hardly have supposed when it enacted Section 1350 that a "crime," but not the comparable "tort," was definable by the law of nations. Nor is there any legislative history of the section to suggest such a limitation.

Accordingly, there is no basis for adopting a narrow interpretation of Section 1350 inviting frustration of the purposes of international law by individual states that enact immunities for government personnel or other such exemptions or limitations. The court concludes that it should determine the substantive principles to be applied by looking to international law, which, as the Court of Appeals stated, "became a part of the common law *of the United States* upon the adoption of the Constitution." 630 F.2d at 886 (emphasis in original); *see also The Nereide,* 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815)' (Marshall, C.J.); *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900).

The international law described by the Court of Appeals does not ordain detailed remedies but sets forth norms. But plainly international "law" does not consist of mere benevolent yearnings never to be given effect. Indeed, the Declaration on the Protection of All Persons from Being Subjected to Torture, General Assembly Resolution 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N. Doc. A/1034 (1975), adopted without dissent by the General Assembly, recites that where an act of torture has been committed by or at the instigation of a public official, the victim shall be afforded redress and compensation "in accordance with national law," art. 11, and that "[e]ach state" shall ensure that all acts of torture are offenses under its criminal law, art. 7.

The international law prohibiting torture established the standard and referred to the national states the task of enforcing it.

By enacting Section 1350 Congress entrusted that task to the federal courts and gave them power to choose and develop federal remedies to effectuate the purposes of the international law incorporated into United States common law.

In order to take the international condemnation of torture seriously this court must adopt a remedy appropriate to the ends and reflective of the nature of the condemnation. Torture is viewed with universal abhorrence; the prohibition of torture by international consensus and express international accords is clear and unambiguous; and "for purposes of civil liability, the torturer has become—like the pirate and the slave trader before him— *hostis humani generis,* an enemy of all mankind." 630 F.2d at 884, 888, 890. We are dealing not with an ordinary case of assault and battery. If the courts of the United States are to adhere to the consensus of the community of humankind, any remedy they fashion must recognize that this case concerns an act so monstrous as to make its perpetrator an outlaw around the globe.

### III

The common law of the United States includes, of course, the principles collected under the rubric of conflict of laws. For the most part in international matters those principles have been concerned with the relevant policies of the interested national states, and with "the needs" of the "international systems." Restatement (Second) of Conflict of Laws (1971) § 6(2). The chief function of international choice-of-law rules has been said to be to further harmonious relations and commercial intercourse between states. *Id.,* comment d.

However, where the nations of the world have adopted a norm in terms so formal and unambiguous as to make it international "law," the interests of the global community transcend those of any one state. That does not mean that traditional choice-of-law principles are irrelevant. Clearly the court should consider the interests of

Paraguay to the extent they do not inhibit the appropriate enforcement of the applicable international law or conflict with the public policy of the United States.

In this case the torture and death of Joelito occurred in Paraguay. The plaintiffs and Pena are Paraguayan and lived in Paraguay when the torture took place, although Dolly Filartiga has applied for permanent asylum in the United States. It was in Paraguay that plaintiffs suffered the claimed injuries, with the exception of the emotional trauma which followed Dolly Filartiga to this country. The parties' relationships with each other and with Joelito were centered in Paraguay.

Moreover, the written Paraguayan law prohibits torture. The Constitution of Paraguay, art. 50. The Paraguayan Penal Code, art. 337, provides that homicide by torture is punishable by a imprisonment for 15 to 20 years. Affidavit of Alejandro Miguel Garro, December 9, 1982 (Garro Aff.), ¶ 31. Paraguay is a signatory to the American Convention on Human Rights, which proscribes the use of torture. Paraguayan law purports to allow recovery for wrongful death, including specific pecuniary damages, "moral damage," and court costs and attorney's fees. Thus, the pertinent formal Paraguayan law is ascertainable.

All these factors make it appropriate to look first to Paraguayan law in determining the remedy for the violation of international law. *See Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Restatement (Second) of Conflict of Laws (1971) § 145(2). It might be objected that, despite Paraguay's official ban on torture, the "law" of that country is what it does in fact, Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457, 461 (1897), and torture persists throughout the country. Amnesty International Report on Torture (1975) 214–16; D. Helfield and W. Wipfler, Mbarete: The Higher Law of Paraguay (The International League for Human Rights, 1980).

Where a nation's pronouncements form part of the consensus establishing an international law, however, it does not lie in the mouth of a citizen of that nation, though it professes one thing and does another, to claim that his country did not mean what it said. In concert with the other nations of the world Paraguay prohibited torture and thereby reaped the benefits the condemnation brought with it. Paraguayan citizens may not pretend that no such condemnation exists. If there be hypocrisy, we can only say with La Rochefoucauld that "hypocrisy is the homage which vice pays to virtue." Reflections; or Sentences and Moral Maxims 218 (1678).

To the extent that Pena might have expected that Paraguay would not hold him responsible for his official acts, that was not a "justified" expectation, Restatement (Second) of Conflict of Laws (1971) § 6(2)(d) and comment g, so as to make unfair the application to him of the written law of Paraguay.

IV

■ Plaintiffs claim punitive damages, and the Magistrate recommended they be denied on the ground that they are not recoverable under the Paraguayan Civil Code. While compensable "moral" injuries under that code include emotional pain and suffering, loss of companionship and disruption of family life, Paraguayan Civil Code, arts. 1102, 1103, 1112, plaintiffs' expert agrees that the code does not provide for what United States courts would call punitive damages. Paraguayan law, in determining the intensity and duration of the suffering and the consequent "moral" damages, takes into account the heinous nature of the tort. However, such damages are not justified by the desire to punish the defendant. They are designed to compensate for the greater pain caused by the atrocious nature of the act. Garro Aff. ¶¶ 33, 34.

Yet because, as the record establishes, Paraguay will not undertake to prosecute Pena for his acts, the objective of the international law making torture punishable as a crime can only be vindicated by imposing punitive damages.

It is true, as plaintiffs concede, that damages designated punitive have rarely been awarded by international tribunals. As explained in M. Whiteman, Damages in International Law 716–17 (1937), the international law of damages has developed chiefly in the resolution of claims by one state on behalf of its nationals against the other state, and the failure to assess exemplary damages as such against a respondent government may be explained by the absence of malice or *mala mens* on the part of an impersonal government. Here Pena and not Paraguay is the defendant. There is no question of punishing a sovereign state or of attempting to hold the people of that state liable for a governmental act in which they played no part.

Moreover, there is some precedent for the award of punitive damages in tort even against a national government. In *I'm Alone (Canada v. United States)*, U.N. Rep.Int.Arb. Awards, vol. 3, at 1609, the American and Canadian claims Commissioners recommended, in addition to compensatory damages, payment of $25,000 by the United States to Canada for intentionally sinking a Canadian ship. In *de Letelier v. Republic of Chile*, 502 F.Supp. 259, 266, 267 (D.D.C.1980), the court awarded $2,000,000 in punitive damages against the Republic of Chile and various of its employees to the survivors and personal representatives of the former Chilean Ambassador to the United States and a passenger in his car, both killed by the explosion of a bomb. While the court imposed the damages under domestic laws, it mentioned that the "tortious actions" proven were "in violation of international law." *Id.* at 266.

Where the defendant is an individual, the same diplomatic considerations that prompt reluctance to impose punitive damages are not present. The Supreme Court in *dicta* has recognized that punishment is an appropriate objective under the law of nations, saying in *The Marianna Flora*, 24 U.S. (11 Wheat.) 1, 41, 6 L.Ed. 405 (1826), that "an attack from revenge and malignity, from gross abuse of power, and a settled purpose of mischief ... may be punished by all the penalties which the law of

nations can properly administer." In developing common law remedies to implement the rights secured by the Constitution, the Supreme Court has stated that courts may award punitive damages in actions based on the Constitution alone, *Carlson v. Green*, 446 U.S. 14, 21–22, 100 S.Ct. 1468, 1472–1473, 64 L.Ed.2d 15 (1980), and based on 42 U.S.C. § 1983, where the legislation makes no reference to the nature and extent of the damages to be awarded. *Smith v. Wade*, — U.S. —, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Carey v. Piphus*, 435 U.S. 247, 257 n. 11, 98 S.Ct. 1042, 1049 n. 11, 55 L.Ed.2d 252 (1978).

This court concludes that it is essential and proper to grant the remedy of punitive damages in order to give effect to the manifest objectives of the international prohibition against torture.

## V

■ In concluding that the plaintiffs were entitled only to damages recoverable under Paraguayan law, the Magistrate recommended they be awarded $150,000 each as compensation for emotional pain and suffering, loss of companionship and disruption of family life. He also suggested that Dolly Filartiga receive $25,000 for her future medical expenses for treatment of her psychiatric impairment and that Dr. Filartiga receive $50,000 for past expenses related to funeral and medical expenses and to lost income. The Magistrate recommended against an award of punitive damages and of $10,364 in expenses incurred in connection with this action. Plaintiffs object only to these last recommendations.

The court finds no reason to reject the opinion of the plaintiffs' expert that the expenses incurred by them in prosecuting this action are compensable under Paraguayan law. Garro Aff. ¶¶ 21, 22. The United States policy against forum shopping does not warrant a denial. Plaintiffs could get no redress in Paraguay and sued Pena where they found him.

■ In deciding to grant punitive damages the court is aware of the concern that

such awards, designed to attain objectives fostered chiefly by the criminal law, are nevertheless made without at least some of the safeguards afforded by that law, such as proof beyond a reasonable doubt and the presumption of innocence. *Cf. Curtis Publishing Co. v. Butts*, 388 U.S. 130, 159, 87 S.Ct. 1975, 1993, 18 L.Ed.2d 1094 (1967); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152, 1172–73 (10th Cir.1981). However, this concern, which may obtain increasing attention in the future, is not pertinent here. Pena has defaulted and has not sought such protections.

In determining the amount of punitive damages the court must consider a variety of factors. Pena's assets are pertinent. *Brink's Inc. v. City of New York*, 546 F.Supp. 403, 413 (S.D.N.Y.1982), but the burden is on the defendant to show his modest means if he wishes them considered in mitigation. *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978). The court has received no evidence on the subject.

■ The nature of the acts is plainly important. *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir.1974); *Promovoyage, S.A.R.L. v. Bosco*, 557 F.Supp. 1366, 1372 (S.D.N.Y. 1983). The court need not comment upon the malice that prompts one man to torture another in reprisal for the deeds of his father or to say to the dead man's sister as she left the corpse "shut up. Here you have what you have been looking for and deserved." (Transcript at 16). Nor would any purpose be served by detailing Pena's conduct. Spread upon the records of this court is the evidence of wounds and of fractures, of burning and beating and of electric shock, of stabbing and whipping and of mutilation, and finally, perhaps mercifully, of death, in short, of the ultimate in human cruelty and brutality.

■ Chief among the considerations the court must weigh is the fact that this case concerns not a local tort but a wrong as to which the world has seen fit to speak. Punitive damages are designed not merely to teach a defendant not to repeat his conduct but to deter others from following his example. *Zarcone v. Perry, supra*, 572 F.2d at 55. To accomplish that purpose this court must make clear the depth of the international revulsion against torture and measure the award in accordance with the enormity of the offense. Thereby the judgment may perhaps have some deterrent effect.

■ There are no binding precedents to guide the court in determining what amount lies within those respectable bounds that hedge the judiciary and yet may serve to come to the attention of those who think to practice torture. There have been large jury verdicts for punitive damages against the press for conduct that no one would claim is comparable to Pena's, for example, $25,000,000, reduced by the district court to $12,500,000, *Pring v. Penthouse International, Ltd.*, No. 79–351 (D.Wyo. May 23, 1979), to Miss Wyoming who claimed that Penthouse Magazine unfavorably identified her in a fictional piece; $2,500,000 against the Alton Telegraph in Illinois for reporting alleged wrongdoing of a contractor to the Justice Department; and $1,300,000 to an actress who asserted that the National Enquirer had implied she had been drunk in a restaurant. Goodale, *Getting Even with the Press*, N.Y.Law J., Aug. 11, 1982, at 1, col. 2. But often such verdicts have been overturned as inconsistent with the First Amendment, *see, e.g., Pring v. Penthouse International, Ltd.*, 695 F.2d 438 (10th Cir.1982), and they are hardly persuasive here.

More pertinent is the punitive award of $2,000,000 by the court in *de Letelier v. Republic of Chile, supra*, for the murder by bombing of the former Chilean Ambassador and his companion. Also germane is *Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 447 F.Supp. 543 (D.Colo. 1977), where the District Court sustained a verdict of $3,000,000 in punitive damages for acts far less reprehensible than those of Pena. There the defendant deceived the plaintiff and invested her life savings of $60,000 in stock options, thereby causing a loss of $30,000 and emotional injury. The court upheld the verdict of $1,030,000 in

compensatory damages and $3,000,000 in punitive damages. The Court of Appeals affirmed on condition that plaintiff accept a reduction in the punitive award to $1,000,000 and a total judgment of $2,030,000. 703 F.2d 1152 (10th Cir.1981).

The decision in *Brink's Inc. v. City of New York, supra,* is also apposite, particularly for the reasoning distinguishing it from this case. There employees of a firm collecting parking meter coins for the City stole some of the proceeds. The jury found punitive damages of $5,000,000 because the firm's management, knowing of repeated illicit activities, recklessly failed to investigate and discharge the employees. The court granted a new trial unless the City agreed to a remittitur in punitive damages to $1,500,000. The court reasoned that the potential of injury to others was minimal because there was little likelihood of a recurrence, and the injury, even assuming repetition, was loss of money "not death or severe personal injury." 546 F.Supp. at 413–14.

The record in this case shows that torture and death are bound to recur unless deterred. This court concludes that an award of punitive damages of no less than $5,000,000 to each plaintiff is appropriate to reflect adherence to the world community's proscription of torture and to attempt to deter its practice.

## VI

Judgment may be entered for plaintiff Dolly M.E. Filartiga in the amount of $5,175,000 and for plaintiff Joel Filartiga in the amount of $5,210,364, a total judgment of $10,385,364. So ordered.