OPINION OF THE COURT
Martin Evans, J.
Plaintiff bond owners commenced this action against defendant bank indenture trustee, alleging negligence and breach of fiduciary duty. Defendant moves for summary judgment dismissing the complaint, claiming that plaintiffs have no rights under the bonds and thus lack standing. The motion requires the court to examine the application of the Act of State doctrine in the context of an alleged *772 novation involving an American obligor and a foreign corporation.
Plaintiffs are the owners[1] of bonds issued by an extant Utah corporation, the National Railroad Company of Mexico (National), in 1902. The obligations in question are part of two series of bonds, denoted “Debt 17” and “Debt 18”. When the bonds were issued, National established a trust to hold the collateral which consisted of existing and after acquired real and personal property in the United States and Mexico, including railroad lines, land and securities. Defendant, by merger and acquisition, is the successor indenture trustee.
During the course of the Mexican government’s nationalization of the Mexican railroads, a “Plan of Readjustment and Union” was promulgated in 1908, under which Ferrocarriles Nacionales de Mexico (Ferrocarriles), the Mexican State railway company, acquired all of the common stock of National and another company, and thereby control of the Mexican railroads owned by National and a Massachusetts corporation, Mexican Central Railway Co. Ltd. By a separate agreement later that year, Ferrocarriles agreed to pay, or cause to be paid, both interest and principal to the holders of the subject bonds and guaranteed payment of principal and interest.
In 1942, during World War II, the Mexican government promulgated a decree which required the registration of securities, bonds and other instruments evidencing Mexican obligations, in order to demonstrate nonenemy ownership, and thereby prevent an outflow of capital to hostile nations. The decree mandated that each instrument be stamped with a legend evidencing registration; all those not so stamped were to be deemed enemy-owned.
Bonds held outside Mexico were to be registered at Mexican consulates and certain designated financial institutions. The registration deadline was extended until after the war’s close, ultimately to 1953. It is not disputed that the 1942 decree purported to apply to the Debt 17 and 18 bonds, which specifically listed them. It is also not disputed *773 that the subject bonds held by plaintiffs have never been registered. It appears that 95.83% of the Debt 17, and 95.50% of the Debt 18 bonds were ultimately registered.
In 1946, as a result of an agreement between the Mexican government and an international committee of bankers, and through purchases on the open market, the Mexican government apparently acquired all of the registered Debt 17 and Debt 18 bonds. The agreement provided that the bonds so acquired in exchange for reduced payments of principal and interest, were to be retired.[2]
In 1951, Mexico promulgated a decree, the Law on the Fate of Enemy Bonds, which purported to vest in the Mexican government title and all rights in bonds and other securities which had not been registered or mandated under the 1942 registration decree. Defendants now claim that, as a result of the 1946 agreement, the 1951 vesting decree and other acquisitions, the Mexican government succeeded to all title and rights in all of the Debt 17 and 18 bonds, both registered and nonregistered.
Nevertheless, between 1942 and 1982, apparently with the knowledge of the Mexican government, defendant made various distributions of accrued, unpaid interest to the private holders of the unregistered bonds.
In 1982, defendant conducted a sale of the American collateral at the instance of the Mexican government. The Mexican government, as the shareholder of National and as the principal owner of the Debt 17 and 18 bonds (which should have been but which apparently had not been retired under the 1946 acquisition agreements) claimed that it was empowered, by the original mortgage and trust agreement to compel liquidation of the collateral. Only one party bid at the sale, and acquired the collateral at the upset price of $31,000,000, which plaintiff claims was deliberately calculated on understated valuations, and was grossly below the market value. The successful bidder was Mexrail, Inc., a Delaware corporation, newly organized and wholly owned by Transportación Marítima Mexicana, *774 S. A. (TMM), a Mexican corporation in which the Mexican government has a 30% interest.[3] Mexrail made payment by check for approximately 4% of the purchase price. The balance was paid by tender of the registered Debt 17 bonds, which had been assigned that day by the Mexican government to TMM, which thereupon assigned them to Mexrail.
It is the gravamen of plaintiff’s complaint that the sale of the collateral was a sham, having been collusively arranged as part of a scheme to defraud the bondholders, including plaintiffs, the Mexican government and the people of Mexico.[4] Plaintiffs further claim that the fraudulent scheme was aided by an officer of defendant, one of defendant’s attorneys and an attorney representing the Mexican government.
Defendant claims that plaintiffs lack standing to challenge the sale, since defendant argues that plaintiffs have no rights arising from the subject obligations. The gravamen of defendant’s claim is that plaintiff’s physical possession of the bonds should not be regarded as representing an ownership interest in the collateral, or as meaning that they are holders of the instruments. Defendant claims that, by virtue of the nonregistration pursuant to the 1942 decree, title in the bonds indefensibly passed to the Mexican government, and that plaintiffs therefore lost, or never acquired, rights in the bonds.
Whether or not plaintiffs have rights in the bonds, thus making them proper parties, depends upon whether or not the bonds in question were properly subject to the 1942 and 1951 Mexican decrees.
The Act of State doctrine precludes American courts from inquiring into the validity of the public acts of a recognized foreign sovereign committed on the sovereign’s own soil, whether or not the acts conformed to the sovereign’s own law.[5] (Underhill v Hernandez, 168 US 250; *775 Banco Nacional de Cuba v Sabbatino, 376 US 398; French v Banco Nacional de Cuba, 23 NY2d 46.) Conversely, since our law ordinarily does not recognize extraterritorial jurisdiction, a sovereign cannot affect the rights of noncitizens outside its borders.
The doctrine is sound in light of legal and political theory. It recognizes both the correct definition and inherent limitation of sovereignty. It is also realistic. Like the doctrine of comity between nations, to which it is intellectually related, it recognizes that at least a modicum of mutual tolerance of a sovereign’s control of its internal affairs is a prerequisite for international stability.
Moreover, the doctrine also flows naturally from the principles underpinning federalism and the separation of powers. The conduct of the Nation’s foreign relations is the exclusive responsibility of the Federal Government, primarily of the executive branch and secondarily of the legislative branch. The judicial branch, particularly that on the State level, should therefore avoid any action which would unnecessarily intrude on the foreign policy making powers of the Federal Government. (See First Nat. City Bank v Banco Nacional de Cuba, 406 US 759.) Conversely, where there is no danger that the ordinary judicial process would impinge on the sovereignty of a foreign power or on that of our own Federal Government, there is no need for judicial abstention. Thus, the courts may exercise their normal authority where the subject matter of the litigation neither concerns the sovereignty of the foreign power nor is subject to it, or where there is a compelling reason, consistent with American National interests, for permitting the courts to so act.
Whether or not a court may act in a given case must be determined by the forum court on the basis of Federal law, *776 based on either general common-law principles (see Banco Nacional de Cuba v Sabbatino, supra; Perez v Chase Manhattan Bank, 61 NY2d 460), Federal statute (see, e.g., Filartiga v Pena-Irala, 630 F2d 876, on remand 577 F Supp 860 [compensation claim under Federal Alien Tort Act (US Code, tit 28, § 1350 et seq.) by Paraguayan distributee of a Paraguayan victim based on torture in Paraguay by defendant Paraguayan police official]), or specific act of the Federal executive (Bernstein v Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 210 F2d 375 [State Department letter opinion expressing view that Nazi expropriation of Jewish owned property was subject to collateral attack in American courts, and that judicial determination of victim’s restitution claim was in the national interest]).
The action at bar is a private, commercial case. It is not controlled by Federal statute. It has never involved the Federal Government, and the Federal Government has not expressed any cognizable interest in it. Any conceivable effect it can have on the conduct of American foreign policy is utterly remote and speculative, no different than that of any other case in an American court requiring the application of foreign law to a private dispute. Neither does the instant case concern Mexican sovereignty. Plaintiffs do not seek to challenge, in this court, the legality of the Mexican railroad nationalization plan or that of the bond registration and vesting decrees. No question has been, or ought to have been, raised here regarding the authority of the Mexican government to adopt such legislation, the regularity of the adoption process, or the binding effect of Mexican law on Mexican nationals’ property. (See Salimoff & Co. v Standard Oil Co., 262 NY 220, 224 [“The courts of one independent government will not sit in judgment upon the validity of the acts of another done within its own territory, even when such government seizes and sells the property of an American citizen within its [own] boundaries”].)
The salient question is whether the unquestioned (and, theoretically, unquestionable) authority of the foreign sovereign embraces the subject matter of the litigation. That is, are the bonds and collateral at issue subject to Mexican *777 law? Governing law has been traditionally determined by the situs of the obligation. The situs of the obligation is determined by that of the debtor obligor, not that of the creditor obligee or that of the instrument evidencing the obligation. (Cities Serv. Co. v McGrath, 342 US 330, see, especially, p 332, n 6; see, also, Harris v Balk, 198 US 215; Weston Banking Corp. v Turkiye Garanti Bankasi, 57 NY2d 315.) The debt is regarded as following the debtor; the logical forum and often the only possible forum, is one where the debtor can be found, since presence is the classic predicate for in personam jurisdiction over the debtor. As the Court of Appeals recently observed: “For purposes of the Act of State doctrine, a debt is located within a foreign State when that State has the power to enforce or collect it * * * If the debtor is present in the foreign State and the debt is payable there, the foreign sovereign then has power to enforce or collect it, and a confiscation of that debt amounts to a seizure of property within that sovereign’s borders.” (Perez v Chase Manhattan Bank, 61 NY2d 460, 469, supra.)[6]
Conversely, where the debtor is not present in the foreign State and the debt is not payable there, the foreign sovereign has no power to enforce or collect it. The debt therefore cannot be conceptualized as being located in the foreign State and a purported confiscation there would amount to an unenforceable extraterritorial act. (See Sokoloff v National City Bank, 239 NY 158; Zeevi & Sons v Grindlays Bank [Uganda], 37 NY2d 220; Vishipco Line v Chase Manhattan Bank, 660 F2d 854, cert den 459 US 976.)
Thus, under the circumstances at bar, was there a taking of property by Mexico within its borders? What was the situs of the subject obligations at the time of the taking? Who was the obligor, and was it present in Mexico at the time of the taking?
Defendant contends that under the 1908 agreement between Ferrocarriles, the Mexican State railroad corporation and National, the Utah corporation that had issued *778 the bonds, Ferrocarriles replaced National as the obligor on the underlying debt. If that contention is correct, Ferrocarriles would have been the obligor at the time of the registration and vesting decrees, thereby situating the obligations in Mexico and subjecting them to Mexican law. However, if the 1908 agreement did not effectively transfer National’s duty of payment to the Mexican corporation, then National would have remained the obligor, and Utah would have remained the situs of the debt, beyond the reach of Mexican law. The original obligation, and all rights of plaintiffs thereunder, would have continued unchanged.
In order to prevail, defendant must prove that the 1908 agreement was effective as a novation, or that the obligees otherwise agreed to the substitution of Ferrocarriles as obligor. It is hornbook law that any transfer of contractual duty so as to discharge the original obligor, requires the obligee’s assent where such transfer alters the substance of the contract or otherwise materially affects the obligee’s rights. (See Restatement, Contracts 2d, § 318, Comment d; §§ 280, 328, 329; 3 Williston, Contracts, § 404 et seq.; 4 Corbin, Contracts, §§ 859-864.)
There can be no doubt that the purported assignment or transfer of a duty to pay under an instrument, from an American to a foreign corporation, may adversely affect the obligee’s rights. Here, the evidence presented, including the unambiguous wording of the 1902 mortgage and bonds themselves, indicated that the original parties contemplated undertaking an obligation in the United States, performable in the United States, measured by American money, and governed by and enforceable under American law. To the extent that transfer of the obligation to pay could make its enforcement more difficult, it substantially alters the parties’ bargain.
Thus, while a transferee may validly agree with an obligor to assume the obligor’s duties, the obligor is not discharged unless the obligee also agrees. Here, it appears that under a 1908 agreement, Ferrocarriles did agree to assume or guarantee National’s obligations under the bonds.[7] The validity and effect of this agreement is not here *779 at issue. Whether the obligations could have been enforced against Ferrocarriles, the assuming party, by National and/or the obligees, either before or after the registration and vesting decrees, is immaterial here. Rather, what is material here is whether there is any evidence to indicate that the obligees ever assented to the substitution of obligor. Suffice to say, none has been adduced.
In order to prove a novation, there must be a “clear and definite intention on the part of all concerned that such is the purpose of the agreement. Not only must the intention to effect a novation be clearly shown, but a novation [must] never * * * be presumed.” (22 NY Jur 2d, Contracts, § 406, pp 321-322.)
The record discloses no such “clear and definite intention” which would permit the court to find a novation as a matter of law. The evidence presented suggests that, under the 1908 nationalization plan, under which National came under the control of Ferrocarriles, and the agreement between them later that year respecting National’s bonds, National may have intended to assign its duty of payment to Ferrocarriles. However, at most, a delegation of duty would have been effected, without a substitution of obligor, or discharge of National’s underlying obligation. (See Restatement, Contracts 2d, § 316, Comment c; § 317, Comment d.) While a delegation of a duty of payment does not necessarily require the obligee’s consent, it does not discharge the original obligor. (Restatement, Contracts 2d, § 318, subd [3].)
The court therefore concludes that the bonds in question were unaffected by the 1908 agreement. They remained what they were at their issuance and have always been — obligations of the National Railroad Company of Mexico, a Utah corporation. While the 1942 and 1951 decrees may have effected a taking of other property in Mexico, the obligations of National remained situate in Utah; they therefore could not have been affected by the Mexican *780 decrees, and were not subject to expropriation by the Mexican government. The Mexican agreements and decrees neither had, nor could have had, any legal effect on National and the holders of its obligations.
The only nexus between National and Mexico was the acquisition of National’s common stock by a Mexican controlled company, and National’s ownership of certain railroads and related property in Mexico. It is not contested that railroads and other property situated in Mexico were, and are, subject to Mexican law. It is also not contested that, despite the stock transfer, National remained a separate and distinct Utah corporate entity which retained certain obligations and property in its own name.
It should therefore be beyond cavil that National, its obligations, and its retained and after acquired property situated in the United States, that composed the collateral for the bonds, have been continuously subject to American law.
Furthermore, the court notes that, notwithstanding the Mexican decrees of 1942 and 1951, defendant had included the holders of plaintiffs’ unregistered bonds as distributees of each of its 14 income distributions between 1942 and 1982. Such distributions, at the very least, prompt the inference that defendant has, by its own conduct, waived any objection to plaintiffs’ standing as obligee bondholders.
Certainly, on the basis of the applicable law and the available evidence, and in the absence of any evidence to the contrary, the court would not be constrained to find that plaintiffs are holders of the bonds and, having rights thereunder, have standing to assert the claims raised in the complaint. While bondholders are not owners of the collateral, since their bonds are secured by the collateral, impairment of the collateral diminishes their rights under the contract evidenced by the bond. It is a non sequitur to suggest that ownership of the collateral is a prerequisite to standing to challenge its sale. Secured parties, by definition, are aggrieved by its impairment. Defendant’s motion for summary judgment dismissing the complaint as a matter of law is accordingly denied.
*781 The complaint raises important factual questions regarding defendant’s exercise of its fiduciary duties, which cannot be determined on this motion. Its performance as indenture trustee, including, inter alia, its sale of the collateral and its acceptance of the registered Debt 17 and 18 bonds as nearly complete payment, must be fully explored in disclosure proceedings. Plaintiff’s cross motion for disclosure is accordingly granted. The order to be settled shall direct a prompt turnover of certified copies of the valuations used by defendant in arranging the sale.
The factual and legal issues in this action are unusually complex. The pretrial litigation is likely to be protracted and may require repeated judicial intervention. Plaintiffs’ motion for assignment to the individual calendar of a single Justice for all purposes may be appropriate. Counsel may request the Administrative Justice of this court to make such an assignment.

. When, from whom, or under what circumstances, each of the plaintiffs came into possession of his bonds, cannot be determined from these papers.

. The agreement also provided that Mexico would recognize preexisting liens on any property covered by the agreement, if that property had been previously expropriated. Exactly what property had been expropriated cannot be determined from these papers.

. The identity of the remaining shareholders cannot be ascertained here, but may well be significant in light of plaintiffs’ claims.

. Plaintiffs are not shareholders of National. They have no apparent connection with Mexico, its government or its people. This action has been brought in the plaintiffs’ individual capacity, in their own names and on their own behalf. It is not, at this time, either a class action or a derivative action. There is no evidence that plaintiffs have standing to represent the interests of parties other than themselves.

. An important exception has emerged for acts in gross violation of accepted standards of international law. (See Filartiga v Pena-Irala, 630 F2d 876, on remand 577 F Supp 860.) The claim of the Paraguayan plaintiffs in Filartiga was based on the torture *775 and death in Paraguay of their decedent at the hands of the defendant, a Paraguayan police official. While torture and murder, under color of law, were held actionable as being indisputably beyond the pale of acceptable civilized conduct (see 630 F2d, at p 878), and while it may be reasonably inferred that other human rights violations may be similarly actionable (supra, at pp 881-884, citing United Nations Charter [59 US Stat 1033], and Universal Declaration of Human Rights [UN Gen Assembly Resolution 217]) it is unclear how far this exception will be permitted to develop. It is, however, safe to assume that it does not now extend to the expropriation by a foreign State of property located with its borders owned by its own nationals. (See Banco Nacional de Cuba v Sabbatino, 376 US, at pp 428-430; F. Palido y Compania v Brush, 256 F Supp 481, 486-487, affd 375 F2d 1011, cert den sub nom. Brush v Republic of Cuba, 389 US 830.)

. It has been recognized that mechanical application of this concept can conflict with other policy considerations and can lead to injustice, particularly where a debt or other intangible can have multiple situs. (See Perez v Chase Manhattan Bank, 61 NY2d 460, 473 [Wachtler, J., dissenting].)

. Indeed, the June, 1908 bond agreement is ambiguous. Given the words of assumption and guarantee used in various paragraphs it is not possible to determine, on *779 these papers, whether the parties intended that Ferrocarriles become the substituted primary obligor, or merely a guarantor of payment. Indeed, in a prior action by defendant’s corporate predecessor, Central Hanover Bank and Trust Company, against Ferrocarriles, Central Hanover took the position that Ferrocarriles was the guarantor of payment.