**In the Matter of PAL TRANSPORT, INC., Debtor.**

**PAL TRANSPORT, INC., Plaintiff,**

**v.**

**ALL FLORIDA RECOVERY AGENCY, INC.; D. H. Pearson; James Detzel; and Paccar Financial Corp., Defendants.**

**Bankruptcy No. 80–1252.**

United States Bankruptcy Court,
M. D. Florida,
Tampa Division.

Sept. 8, 1981.

Harley Riedel, Tampa Fla., for plaintiff.

Philip Lazzara, Jeffrey Warren, Tampa Fla., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a business reorganization case instituted by Pal Transport, Inc. (Pal), the Plaintiff involved in the above-captioned adversary proceeding. Pal filed this action against All Florida Recovery Agency, Inc. (All Florida), D.H. Pearson (Pearson), James Detzel (Detzel) and Paccar Financial Corp. (Paccar). The Amended complaint consists of two counts. In Count I, Pal seeks to recover damages, including punitive damages, against all Defendants based on an alleged wrongful repossession of certain tractors owned by Pal. This claim is based on the alleged violation of the automatic stay imposed by § 362(a) of the Bankruptcy Code. Pal originally sought to recover in this Count its loss of profits but later abandoned this claim. In Count II, Pal claims that it is entitled to recover damages, including attorney fees and punitive damages against the Defendants based on conversion or trespass and for an alleged violation of Fla.Stat. 679.501 et seq.

In due course, the Defendants filed their answers, but, in addition, All Florida filed a cross-claim against Paccar. The cross-claim sets forth three counts. In Count I, All Florida asserts the right of indemnification from Paccar in the event the Plaintiff, Pal, recovers a judgment against All Florida. This claim for indemnity is based on an alleged oral agreement whereby Paccar agreed to indemnify All Florida if All Florida became liable to Pal as the result of "peaceful" repossession effectuated by All Florida on behalf of Paccar. All Florida also seeks, as part of its claim for indemnification, a reimbursement of its costs and attorney's fees incurred by it in connection with the defense of this particular lawsuit. This claim is set forth in Count II of the cross-claim. In Count III, All Florida seeks to recover the sum of $894.46 which is the charge by All Florida for the services rendered at the request of Paccar in connection with the repossession of the tractors involved in this controversy.

Paccar filed its answer to the cross-claim. The answer contains some general admissions and some general denials and also claims a set-off. In addition, Paccar also filed a cross-claim against All Florida and claims that in the event it is held liable to Pal, it is entitled to recovery from All Florida on the theory that if there was a liability it was due to the carelessness and negligence of All Florida. All Florida filed an

answer to the cross-claim of Paccar, generally denying the charge of negligence.

The events which led to this controversy as developed at the final evidentiary hearing are as follows:

Patricia Price, aka Patricia Lewis, is the president of Pal and was one of the principals who organized Pal in 1979. At that time she was married to Mr. A.R. Lewis. Pal was organized for the purpose of engaging in the trucking business. Mr. Lewis was a truck driver by profession. Patricia Price had no expertise or background in the trucking business and prior to forming Pal operated, and still operates, mobile home parks under the name of Alleghany Properties (Alleghany).

Shortly after the formation of the corporation, Pal purchased four tractors: one 1980 Peterbilt and three 1980 Kenworths. In addition, Pal also purchased five trailers. The acquisition of the tractors was financed through Paccar, the financing arm of Paccar Manufacturing, the manufacturer who builds Peterbilt and Kenworth tractors. The loan application submitted to Paccar in connection with this purchase indicates that Patricia Price was self-employed and was doing business as Alleghany Properties at the time of the purchase. The security agreement executed in conjunction with the acquisition of the Peterbilt (Pl's Exh. # 8) was signed by A.R. Lewis, but only as president of Pal and indicated that the purchaser was Pal Transport, Inc. The Security Agreement executed in connection with the three Kenworths (Pl's Exh. # 9) also indicated Pal Transport, Inc. to be the buyer, although Mr. and Mrs. Lewis did co-sign and became guarantors of the balance due on these acquisitions.

The marriage of A.R. Lewis and Patricia Price did not last long, neither did the trucking business of Pal. In January of 1980, Mr. Lewis surrendered his stock in Pal, was removed as president and was replaced by Patricia Price who ever since has functioned as the acting president and the sole executive of Pal and, of course, has become the sole stockholder of Pal. After the departure of Mr. Lewis, Patricia Price hired Mr. Ronnie Clayton who took over the driving and actually handled the trucking business. Pal, due to business reverses, primarily because of lack of expertise of Ms. Price of managing a trucking business, has not been able to keep up the monthly payments due to Paccar on the two contracts and fell behind on its contractual monthly payment obligations owed to Paccar.

The record reveals that in February of 1980, Patricia Price advised the Atlanta office of Paccar, the office which was in charge of the loans relating to the three Kenworth tractors, that A.R. Lewis was no longer her husband and that he no longer had any connection with Pal. It further appears that in May of 1980, Patricia Price met with Buddy McCormick, an employee of Paccar's Atlanta office and with a local Kenworth dealer, at which time she informed Buddy McCormick again that A.R. Lewis had no authority to speak on behalf of Pal and no longer had anything to do with Pal.

It is without serious dispute that both the tractors and the trailers were stored and were idle since May of 1980. This appears to be due to the loss of a lease Pal had with Refrigerated Transport and also due to the apprehension of Patricia Price that her former husband would try to cause the units to be repossessed and then acquire the same from Paccar after repossession.

On August 5, 1980, Paccar filed an action for replevin in the Circuit Court of Hillsborough County, Florida. The action named Pal, Patricia Price Lewis and A.R. Lewis as defendants. On August 14, 1980, an Order to Show Cause was issued (Paccar's Exh. # 1) by the circuit judge. According to the return of the sheriff, it was not served on any of the defendants. The Clerk of the Circuit Court issued an Alias Summons (Paccar's Exh. # 2) which was ultimately served on August 21, 1980 on Yvonne McAllister, the secretary/treasurer of Pal.

On August 25, 1980, Mr. Pearson, the president of All Florida, which is a corpora-

tion engaged in the recovery of properties primarily through repossession on behalf of holders of liens on motor vehicles, received a telephonic request from Mr. Smith, Collection Manager of Paccar, to repossess the Peterbilt. Initially, Mr. Smith informed Mr. Pearson that the tractor to be repossessed was a 1980 Peterbilt owned by "Alleghany Properties." Upon receipt of this communication Pearson at once typed up the information furnished to him by Smith and prepared an assignment form (Pl's Exh. # 4) on the stationery of All Florida which, again, contained the information furnished by Smith. This appears to be the customary practice in the industry. Shortly thereafter, Smith called again and informed Pearson that the Peterbilt was located in Dade City and would be parked close to the home of one Ronnie Clayton. Smith also informed Pearson that there was a 1980 Fruehauf trailer attached to the tractor. Smith suggested that Pearson contact the office of Fruehauf in Nashville in order to arrange for the repossession of the trailer. Pearson followed this through forthwith and obtained an authorization from the Nashville office of Fruehauf to repossess the trailer (Pl's Exh. # 6 and # 7). Smith made it clear to Pearson that the matter was of the utmost urgency and requested to be kept advised of the progress of the operation regardless of the time of day.

Pearson assigned the actual task of repossession to James Detzel, an employee of All Florida. Detzel and a driver, in compliance with the instructions given by Pearson, proceeded forthwith to Clayton's residence and located the Peterbilt and the Fruehauf trailer. While in the process of verifying the identification numbers of the Peterbilt by using a flashlight, they were approached by a person who identified himself as Ronnie Clayton who objected to their presence. As the result of an ensuing argument during which Clayton told Detzel that "bankruptcy was being filed," Detzel called the office of the sheriff in order to resolve the dispute. A deputy sheriff who responded to the call apparently persuaded Detzel not to proceed with the repossession. As a result the mission of Detzel to reposses the Peterbilt was aborted.

The following morning, on the 26th of August, Smith called Pearson at 9:00 a.m. and told him to proceed with the repossession and also to reposses the three Kenworth units. It further appears that Clayton also told Smith earlier about the pendency of bankruptcy. There is evidence in this record that during the conversation between Smith and Pearson bankruptcy was also discussed and Smith stated that the only thing he knew was what Clayton had told him the day before. Thereafter, there were several telephone conversations between Smith and Clayton, but there was to be no attempt to contact Patricia Price. However, Smith contacted A.R. Lewis, the former president of Pal and the former husband of Patricia Price. In spite of the undeniable fact that the employees of Paccar knew that Mr. Lewis was no longer President of Pal, it is curious indeed that Smith rather than contacting Patricia Price concerning the repossession, communicated with A.R. Lewis. Lewis expressed surprise to learn about the development, but the record is unclear whether or not he told Smith that he no longer had anything to do with Pal. The crucial phone call came from Clayton who told Smith that he agreed to surrender the units peacefully at 11:00 a.m. Upon receipt of this information, Pearson called Detzel and instructed him to proceed to Clayton's house and complete the repossession. Detzel complied and located the units in Clayton's yard. After initial unsuccessful attempts to get the Peterbilt started and after moving a truck not involved in this controversy, which apparently blocked the exit, the driver finally started the Peterbilt and brought the Peterbilt, together with the Fruehauf trailer back to Tampa. Pearson apparently became concerned about the propriety of the repossession, and sought a confirmation from Smith through a telegram which was sent by Smith on August 26 at 11:02 a.m., reaffirming the authority granted to Pearson for the repos-

session of the Peterbilt and the three Kenworths (Pl's Exh. # 3).

Patricia Price first consulted counsel concerning the feasibility of seeking relief in the bankruptcy court on August 18. The petition for relief was, in fact, filed on August 25. There is no doubt that neither Smith, Pearson nor Detzel was officially notified of the actual filing, although there is no question that the subject of bankruptcy came up repeatedly during the several conversations between Smith, Pearson, Clayton and Detzel. The fact of the matter is, and this is uncontradicted, that Patricia Price called Pearson on August 26, sometime before noon and before the actual taking of the units, that Pal did, in fact, file a Chapter 11 proceeding in Tampa but Pearson responded that "he doesn't care." The first formal notification to anyone that the case actually has been filed did not occur until August 25. According to the certificate of service on file, the notice was mailed to Donald G. Jacobsen, local counsel for Paccar who no doubt received the notice after the repossession was completed (Paccar's Exh. # 4).

Pursuant to instructions of Mr. Jacobsen, the units were returned to Pal Friday, three days after they had been repossessed. While originally Pal claimed that certain items were removed from the units and were missing when the units were returned, Pal failed to present any proof in support of this claim and this claim is now deemed to be abandoned. Considering the claim of actual damages suffered as a result of the repossession, the only matter introduced into evidence is an invoice in the amount of $160 (Pl's Exh. # 10) showing the purchase of gasoline from a Jacksonville gasoline station. It is difficult to understand, in the absence of an explanation, why one would go to Jacksonville for gas for a truck to be moved from Tampa to Lakeland. Pal offered no other evidence in support of any other damages suffered. As noted earlier, all units owned by Pal have been idle for several months generating no income,

therefore, any claim for loss of earnings or loss of profits lacks any acceptable evidentiary base.

■ It further appears that Ronnie Clayton, the person who was intimately involved in this transaction, was available to testify and was subject to subpoena, but Pal apparently did not consider it to be important to assure his attendance at the trial. Clayton disappeared only one week before the trial. This matter was pending for quite a while and it is somewhat puzzling why Pal did not assure his appearance. Under the established rule of evidence one must assume, therefore, that his testimony would have been adverse to Pal. It is a well-settled rule of evidence that if a party knows the existence of an available witness on a material issue and such witness is within his control and if without satisfactory explanation he fails to call him, an inference may be drawn that the testimony of the witness would not have been favorable to such party. *Culbertson v. The Streamer Southern Belle*, 59 U.S. (19 HOW.) 584, 15 L.Ed. 493 (1856); *Southern Cross Steamship Co. v. Firipis*, 285 F.2d 651 (4th Cir. 1960); 29 Am.Jur.2d *Evidence*, § 180; Annot.; 5 A.L. R.2d § 22 at 943.

This is the factual backdrop of this controversy against which this court is called upon to consider the merits of the Plaintiff's claim for the specific reliefs which it seeks.

Count I of the complaint seeks compensatory and punitive damages for alleged wrongful repossession of the vehicles involved in violation of the automatic stay imposed by § 362 of the Bankruptcy Code. Count II is based on either conversion or trespass to chattels and is claimed to be a violation of Fla.Stat. § 679.501 et seq. and seeks a money judgment.

■ Considering the claim set forth in Count I first, it is well established that a willful violation of the automatic stay may be punished as a civil contempt under the general powers granted to a Bankruptcy

Court by § 105 of the Bankruptcy Code, and Bankruptcy Rule 920. *Fidelity Mortgage Investors Co. v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976), *cert. den.*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977). Bankruptcy Rule 920, which for the first time, authorized the bankruptcy judge to punish for contempt but placed a monetary limit on the fine which may be imposed by a bankruptcy judge and prohibited a punishment by imprisonment. Since the Code is silent on this subject, there is no question that Bankruptcy Rule 920 still applies and still carries forward the limitations placed on the bankruptcy judge's power to punish for contempt.

The Plaintiff in Count I, however, does not seek a punishment of the Defendant for contempt, but seeks compensatory and punitive damages based on the alleged violation of the automatic stay. Whether or not a violation of the automatic stay gives merely a right to seek punishment by fine or, by implication, gives rise to a civil cause of action for damages, compensatory and punitive, is unresolved and the cases are unclear on this point. As stated in the case of *In re Reed*, 11 B.R. 258, 4 C.B.C.2d 736 (Bkrtcy.D. Utah 1981), there is serious doubt whether or not there is a common law claim for trespass or intentional infliction of emotional distress based on violation of the automatic stay, on the theory that there is an implied private civil relief available under § 362(a). On the contrary, it appears at present, that courts are reluctant to imply an independant civil remedy based on the violation of a civil statute unless the statute itself provides for such relief. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); Pillar, *Negative Implication: The Demise of Private Rights of Action in the Federal Courts*, 47 U.Cinn.L. Rev. 1 (1978).

This Court is not unaware that in *Reed, supra*, the court stated that a debtor may seek compensation for its injuries in connection with a violation of § 362(a). Although the court did not cite any authority in support of this proposition, it seemed to imply that the violation of the automatic stay gives rise to dual rights; one which permits punishment for contempt and another the right to recover damages, compensatory or punitive. Accordingly, it is logical to conclude from this, if one accepts this postulate, that while there is a restriction on the power to punish for contempt, there is none if there is an award of damages either compensatory or punitive for violation of the automatic stay and the Bankruptcy Court may award damages, compensatory and punitive, far in excess of the $250 limitation imposed by Bankruptcy Rule 920. To accept this proposition would, of course, render the provisions of Bankruptcy Rule 920 largely meaningless. This is so because in every automatic stay violation case, the injured party could show some actual damages, albeit, minimal and would then seek punitive damages rather then follow the contempt procedures prescribed by Bankruptcy Rule 920.

This conclusion does not mean, however, that the injured party may not assert a common law claim under the applicable local law which in this instance would be based either on conversion or trespass or both. A claim based on these theories, of course, would have nothing to do with contempt, but merely represent an ordinary tort claim which, of course, is governed by ordinary tort principles and not governed by Bankruptcy Rule 920. There is no such claim asserted in the present instance. cf. *First Arlington National Bank v. Barney's Boats of Chicago*, 616 F.2d 164 (5th Cir. 1980), *reh. den.* (conversion based on Texas law).

 Even assuming, but not admitting, that the violation of the automatic stay would give rise to a private civil remedy, a proposition not conceded, there is no question that notice or actual knowledge of the automatic stay is indispensable to a finding of contempt. *United States v. Peterson*, 456 F.2d 1135, 1139 (10th Cir. 1972). It is

well established that a contempt is a drastic remedy which should be invoked only when the right to its use is clear. Id. Courts are in agreement that the contemnor must have either a notice or actual knowledge of the operation of the automatic stay and not merely an awareness of the possibility of the pendency of a bankruptcy case. While it is true that a person may be in contempt of court if it knowingly violates a court order whether or not he received a formal notice of the entry of the order, there is no question that the actual knowledge of the pendency of the case is indispensable and necessary. Thus, in the case of *Fidelity Mortgage Investors Co. v. Camelia Builders, Inc., supra,* the attorneys did not receive a notice of the Chapter XI filing, but read in the Wall Street Journal that the case was actually filed, the day after the petition was filed, but prior to the initiation of the state court action in Mississippi. In addition, one of the contemnors read about the pendency of the case in state court papers and read Bankruptcy Rule 11–44, the Rule which imposed the automatic stay in arrangement proceedings filed under Chapter XI of the Act. He also had a conversation with the Clerk of the Bankruptcy Court and the very complaint filed in Mississippi made reference to the pendency of the arrangement proceeding. In spite of this, they filed a lien foreclosure action in Mississippi two months after the Chapter XI filing.

While it is true that the automatic stay is imposed automatically and no order is actually entered, the party in violation of the stay must actually know of its existence, if not its exact reach and the precise proscription contained therein.

The Fifth Circuit in a pre-Code case, *In re Hailey,* 621 F.2d 169 (5th Cir. 1980) held that "[b]efore a contempt lies, the parties must have actual knowledge of the order and the order must be sufficiently specific to be enforceable." Id.

■ That factual picture is a far cry from the factual picture in the present in-

stance. In *Fidelity Mortgage, supra,* there is no doubt that the Defendants were resolved to recover the units at all costs. This record leaves no doubt that the Defendants employed all ploys of their trade in order to accomplish their goal. There is equally no question that at least some of them had a bit more than a mere suspicion that some kind of bankruptcy proceeding either was imminent or actually pending. There is no doubt that the Defendants were racing against time and were anxious to complete the repossession before they were notified of the bankruptcy. In spite of this, the Defendants' conduct does not rise to the level of contempt simply because this record is devoid of any evidence that any of these Defendants had any actual knowledge or understanding of the existence or extent of the automatic stay.

In light of the foregoing, this Court is satisfied that the claim set forth in Count I of the complaint cannot be sustained.

This leaves for consideration the claim set forth in Count II. This claim is based on an alleged conversion of a truck and an alleged trespass to chattels in violation of F.S. § 679.501 et seq. The claim set forth in this court seems to be based on the proposition that Detzel, an agent of Florida Recovery, entered Ronnie Clayton's yard where the vehicles were stored and moved a truck which was blocking the entry to the yard thereby committing both the alleged trespass to chattels and conversion.

The difficulty with this claim should be obvious when one keeps in mind, first, that the alleged unlawful entry was an entry into a real property owned by Ronnie Clayton and not by Pal and the trespass to chattel was again not to any property of Pal; thus, it is obvious that Pal has no standing to complain about the actions of Detzel. Moreover, there is evidence in this record which is uncontradicted that Ronnie Clayton consented to the repossession.

■ Any reference to an alleged violation of Fla.Stat. § 679.501 et seq. equally

fails to find any evidentiary support in this record. There is no question that Pal was in default on the contracts and in the absence of the prohibition against repossession imposed by Bankruptcy Code by the automatic stay, it had a legal right under Chapter 679.503 to take possession of the collateral after default. It is well established that a creditor may reposses the collateral provided the repossession is peaceful and does not amount to an unlawful trespass or breach of peace. *Percifield v. State*, 93 Fla. 247, 111 So. 519 (1927). Thus, when there is no entry into a home or into another closed building on the premises a peaceful repossession pursuant to the Statute is not unlawful and is not trespass or breach of peace which in turn would give rise to a cognizable claim. *Raffa v. Dania Bank*, 321 So.2d 83 (Fla. 4th DCA 1975). In the present instance, Detzel and the driver only entered into a yard without breaking a fence or a curtilage and did not enter the home or other closed building on the premises when they moved the truck which blocked the driveway. Under these facts, one cannot find a conversion or trespass which is actionable under the laws of this State.

Count III of the crossclaim filed by All Florida against Paccar to recover $894.46 does not appear to be in dispute but the balance of the claims by the Defendants are moot since the Plaintiff failed to obtain recovery against any of the Defendants.

A separate final judgment will be entered in accordance with the foregoing.