**In the Matter of UNIT, INC., Debtor.**

**Bankruptcy No. 1–75–1989.**

United States Bankruptcy Court,
S.D. Ohio.

Sept. 14, 1984.

---

8. *In re Pellegrino, supra,* at 136–136.

Michael Kohn, Cincinnati, Ohio, for debtor.

Morris W. Berger, Michael Hahalyak, Pittsburgh, Pa., for limited partners.

### FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter XI Bankruptcy Act case is before the Court pursuant to a Motion to Enforce Settlement Agreement and For Authority to Compromise Claims and Execute Releases. This dispute recently passed its fourth anniversary. It has been dredged through numerous proceedings in a number of courts, both state and federal, with no resolution of the issues forthcoming. This Court must now decide whether the parties consummated a settlement during negotiations which took place in Pittsburgh, Pennsylvania on June 21 and 22, 1984. The debtor argues that a complete settlement of all of the parties' differences was reached; the claimants argue with equal vigor that no meeting of the minds occurred.

A detailed history of the underlying dispute is necessary in order to put this motion into its proper context. At the time it filed its Chapter XI petition nearly nine years ago, Unit, Inc. was engaged in the development and management of real estate, both on its own and in partnership with numerous other firms around the country. Among the partnerships was B & B Properties, a Kentucky limited partnership formed in 1971 to develop real estate known as Patchen Place apartments, located in Fayette County, Kentucky. Unit was the sole general partner of the firm, and initially held a 12½% interest in the profits and losses. Robert J. Blum, a special limited partner, held a 12½% interest, and the 18 limited partners held a 75% interest. The partnership property consisted of certain real estate held by Unit and Blum, as well as $564,000 contributed in varying amounts by the limited partners. (See Amended Partnership Agreement.)

On June 9, 1980 Unit filed an application with this court to sell Patchen Place to Patchen Investment Group for $5.3 million. (Official Court File No. 12, Case No. B–1–75–1989, hereafter referred to as "OCF"). All creditors were given notice of this application. The limited partners of B & B Properties were not given notice, presumably because they were not listed as creditors at the time.

On June 19, 1980 Bankruptcy Judge Leonard C. Gartner entered an Order authorizing the sale of Patchen Place on the terms set forth in the June 9 application. The limited partners were served with this Order, and were given until June 30 to notify Unit of their intent to withhold their consent to the sale. (OCF 13).

Between June 26, 1980 and July 1, 1980 some 13 of the 18 limited partners objected to the sale.[1] While their reasons for doing so were not fully explained, some of the partners expressed concern over adverse tax consequences and the potential for better offers on the property.

According to notes found in OCF 13, the court held an informal conference among the parties on June 30, 1980. The legal representatives of the limited partners (Mr. Morris W. Berger of Berger & Kapetan, Pittsburgh, Pennsylvania and Mr. Michael Hahalyak, also of Pittsburgh) were given 7 days to file formal objections to the sale. A hearing on those objections was to be held within 90 days.

Thereafter, the parties engaged in furious motion and discovery practice. On July 3, 1980 Unit moved to strike the objections to the sale on the grounds that the partners had no standing to sue pursuant to certain clauses in the partnership agreement. The limited partners moved to strike this motion to strike, and also moved for reconsideration of the June 19 order approving the sale on subject matter jurisdiction and due process grounds. Not to be outdone, Unit moved to strike the limited partners' motion to strike Unit's motion to strike. (See, OCF 13). By order of July 25, 1980, all of these matters, including the question of whether the limited partners' lack of consent to the sale was unreasonable were set down for an evidentiary hearing to be held on October 20.

On the same day this Order issued, the limited partners filed a memorandum of law in which they indicated that Unit had been removed as the general partner of B & B Properties, and thus lacked capacity to act in its behalf. However, no attempt was made to obtain relief from the automatic stay imposed by Rule 11–44 of the Rules of Bankruptcy Procedure prior to this purported ouster of Unit.

One of the many strange turns in the history of this dispute occurred on August 11, 1984, when Unit sought to withdraw its application to sell Patchen Place. The reason centered on a suit which had been filed in the Circuit Court of Fayette, County, Kentucky by Patchen Investment Group seeking a declaration that the limited partners had no standing to object to the sale, or in the alternative that their refusal to consent to the sale was unreasonable. This suit is hereafter referred to as Fayette Circuit Court I. Astonishingly, the limited partners *objected* to the withdrawal of the application, on the grounds that Unit was attempting to "circumvent the jurisdiction of this Court" and to have the Kentucky Court decide the issue of approval of the sale, "whereas it is the Bankruptcy Division which has that power." ("Answer to Application to Withdraw," filed August 18, 1980, OCF 13).

In an Order dated August 21, 1980, Judge Gartner noted the irony of this total about-face by the limited partners as to the jurisdiction issue, as well as Unit's hasty retreat from its attempt to sell the property. To avoid duplication of effort in the state and federal courts, he stayed the Bankruptcy Court action "pending some results from its southern neighbor." (OCF 13).

The litigious mischief that began in the Bankruptcy Court continued in Fayette Circuit Court I. Both Unit and the limited partners purported to represent B & B Properties, each claimed the other lacked capacity to do so, and each filed claims for damages against the other. Vexatious motion and discovery practice ensued. (Appendix I to Unit, Inc.'s Motion to Reconsider August 21, 1980 Suspension Order).

In the meantime, the limited partners through their attorneys, Hahalyak and Berger, stepped up their efforts to consummate their removal of Unit, Inc. as the general partner of B & B Properties. On

---

1. According to OCF 13, the following limited partners objected: Robert C. Pearlman, Edward W. Jew, William Reisinger, Robert J. Wise, Berger & Kapetan, S. David & Roslyn Litman, Allen Saks, Ralph J. Simons, Fernand M. Parent, Michael Hahalyak, John W. Simpson, C.J. Hodder, and Joseph M. Behun.

April 21, 1981 a meeting of the limited partners allegedly took place during which Unit, Inc. was removed as general partner and was replaced by A. Dean Bartlett, Inc. of Pittsburgh. After at least one attempt by Hahalyak to seize the partnership books and records held by Unit, Inc., on June 8, 1981 Judge Gartner entered a supplemental stay order which states in pertinent part as follows:

> ORDERED that all persons be, and they hereby are, enjoined and stayed from interfering with the partnership interests, and status, of Unit, Inc. in B & B Properties ... and from seizing, possessing or disposing of books and records of Unit, Inc., whether or not related to the aforementioned partnerships ...

The focus of activity again shifted to the Bankruptcy Court when on August 26, 1981 Unit filed an application to sell its partnership interests in B & B Properties to Patchen Investment Group for $300,000 cash and a $200,000 promissory note.[2] The purchase agreement also provided for the delegation of Unit's management rights with respect to Patchen Place, and the Bankruptcy Court's retention of jurisdiction over Unit's rights and obligations "until payment in full of the promissory note." All creditors and parties in interest were sent notice of the filing of this application. It is not clear from the record whether all limited partners were given notice. (OCF 15).

On September 14, 1981 Judge Burton Perlman of this Court conducted an evidentiary hearing on this application.[3] No objections to the application were filed and no one raised an objection during the hearing. From the tape of that hearing, it appears that Unit sought approval not only for the sale of its partnership interest to Patchen Investment, but also for the sale of Patchen Place as well. It also appears that Unit obtained the consent of 11 of the 18 limited partners for this sale. Certain of those limited partners conditioned their consent upon Patchen Investment indemnifying them for any attorneys' fees which Hahalyak and Berger might attempt to collect from them. Judge Perlman subsequently approved the application on November 6, 1981. (OCF 16).

Again ignoring both the automatic stay and this Court's June 8, 1981 supplemental stay order, on March 18, 1982 Hahalyak and Berger on behalf of A. Dean Bartlett Inc. filed an action in the Court of Common Pleas of Allegheny County, Pennsylvania seeking to enjoin Unit, Inc. from operating the business of B & B Properties and to require Unit to turn over the books and records of the partnership. Unit promptly removed this action to the U.S. District Court for the Western District of Pennsylvania, and then moved to dismiss, transfer or stay the proceedings. On November 10, 1982, the case was transferred to the U.S. District Court for the Southern District of Ohio in Cincinnati. (Appendix II to Unit, Inc.'s Motion to Reconsider August 21, 1980 Suspension Order, Doc. 10).

Meanwhile, activity continued in Fayette Circuit Court I. On October 12, 1982, Fayette Circuit Court Judge Armand Angelucci issued an Opinion and Order regarding a motion for summary judgment filed by Patchen Investment Group and a motion for judgment on the pleadings filed by B & B Properties. The Court found that material issues of fact existed as to Patchen Investment's claims that the limited partners unreasonably withheld their consent to the sale of Patchen Place and their standing to reject the sale, and accordingly denied the motion. He granted judgment on the pleadings as to B & B's claim that no breach of contract occurred, finding that the approval of the limited partners was a condition precedent to enforcement of the

---

2. The application indicates that Unit is both a general and limited partner holding a 25% interest in the firm. This additional 12½% interest was acquired from Blum's conveyance of his special limited partnership interest to Unit.

3. Judge Perlman assumed much of the responsibility for handling this case when Judge Gartner became seriously ill. Judge Gartner subsequently passed away on May 31, 1982.

contract, and thus "the contract never came into existence."

Thereafter, on February 18, 1983, Patchen Investment moved to amend its complaint to allege that certain powers of attorney given to Hahalyak and Berger by the limited partners were invalid. (Appendix I to Unit, Inc.'s Motion to Reconsider August 21, 1980 Suspension Order, Doc. 34) To add to the confusion, on February 22, 1983 Patchen Investment instituted a second action in Fayette Circuit Court against B & B Properties. This complaint also sets forth the power of attorney issue, but further states that Patchen Place was sold to Patchen Investment pursuant to an agreement dated August 31, 1981. Both Fayette Circuit Court I and Fayette Circuit Court II are still pending as of the date of this order. To this Court's knowledge, a trial on the merits has neither been held nor scheduled in either case.

Shortly after this new round of litigation was commenced in Kentucky, the litigation pending in Cincinnati reignited. Additional rounds of deposition notices, requests for production of documents, and interrogatories were exchanged. On June 14, 1983, Unit renewed its motion to dismiss or stay the proceedings. Rather than responding, on July 22, 1983, Dean Bartlett, Inc. and B & B Properties filed a voluntary dismissal without prejudice. (Appendix II, Unit's Motion to Reconsider August 21, 1980 Suspension Order, Doc. 25.)

Seven days later, Bartlett, Hahalyak and Berger & Kapetan once again violated this Court's automatic and supplemental stays by filing a new complaint against Unit, Inc., this time in the United States District Court for the Eastern District of Kentucky. Significantly, no other limited partners are listed as named plaintiffs. Among other things, this action challenges the validity of the sale of Patchen Place to Patchen Investment. The customary counterclaims, requests to produce, interrogatories, deposition notices, and motions to compel followed. To this Court's knowledge, this action has not progressed beyond the pleading stage, and a trial on the merits is not yet scheduled.

On July 29, 1983, the same day the District Court action was filed in Kentucky, Unit, Inc. objected in this Court to the January 22, 1982 proof of claim filed by Berger and Hahalyak on behalf of the limited partners. That proof of claim seeks a distribution to the limited partners of $139,-810 in minimum payments which Unit as general partner was obligated to pay under the partnership agreement. It also seeks recovery of $212,447 in unauthorized compensation which Unit allegedly took as general partner. Unit's objection also contains a counterclaim seeking a total of $873,881 on certain demand promissory notes executed by the limited partners and for advances made by Unit during the construction of Patchen Place (OCF Contested File "B"). This new contested matter generated yet another round of interrogatories, deposition notices, and motions addressed to the pleadings.

With four different actions on essentially the same issues pending in various stages of litigation gridlock, and with the B & B Properties imbroglio standing as the last obstacle to Unit's reorganization, on February 21, 1984, Unit filed a motion to have this Court reconsider its August 21, 1980 order staying the Bankruptcy Court litigation. (OCF Contested File "B", Doc. B–20) In an effort to bring order out of chaos, and to finally resolve the parties' differences, on May 2, 1984, this Court granted Unit's motion, and set all unresolved issues for trial to commence July 16, 1984.

The next significant development in this saga occurred late in the afternoon on June 22, 1984. At approximately 4:15 p.m. the undersigned received a telephone call from Unit's counsel, Michael Kohn, with Michael Hahalyak also on the line. They reported that they had had intensive settlement negotiations over the preceding two days, and that they had reached an agreement which would resolve all of the litigation pending in all courts. Mr. Hahalyak was particularly emphatic, stating that there was no question but that they "had a deal." Ha-

halyak was unable to locate one of his clients for purposes of receiving final approval of the settlement. Both attorneys requested, and were granted, an extension of the discovery cut-off date until July 10, 1984, but it was understood that this extension was merely for the purpose of obtaining signatures on the appropriate settlement documents. Notwithstanding Hahalyak's representations to this Court, both Berger and Hahalyak now deny that any agreement was ever reached between the parties. This renouncement prompted the filing of the instant motion. Pursuant to the guidelines provided by *Kukla v. National Distillers Products Co.*, 483 F.2d 619 (6th Cir.1973), on July 16, 1984, this Court conducted an evidentiary hearing to determine whether a meeting of the minds did in fact occur.

Not surprisingly, the parties' versions of what transpired in Pittsburgh are sharply divergent. According to Kohn, on June 19, 1984, Berger contacted him regarding the possibility of settling all their differences. Kohn agreed to travel to Pittsburgh for such discussions, on the condition that Berger's clients be present. Berger stated that it would not be fruitful to have his clients present, but assured Kohn that he had settlement authority from his clients.

On June 21, 1984, Kohn travelled to Pittsburgh and met Berger and Hahalyak in the offices of Berger & Kapetan at approximately 7:00 a.m. He immediately was introduced to Alex Kapetan, a senior partner in the firm. As the day progressed, Kapetan assumed the role of a mediator between the parties. Indeed, the bulk of negotiations was conducted between Kapetan and Kohn outside of the presence of Hahalyak and Berger. Finally, Kapetan made a settlement offer which he asked Kohn to convey to his clients and to Mr. Thomas Burnett, Esq., attorney for Patchen Investment Group. Kapetan stated that if the offer was accepted, then the entire controversy was settled. The terms of the offer consisted of the payment of $400,000 in cash plus the $200,000 promissory note given to Unit by Patchen Investment as a part of the purchase price for Unit's gener-al partnership interest. In exchange, Berger and Hahalyak, and the other limited partners were to sign mutual releases which would terminate all litigation among the parties, and were to consent to the sale of Patchen Place.

The terms of this offer were conveyed to Burnett by telephone, with Kapetan present. Burnett agreed to the terms of the settlement, as did Kohn. Kohn then met with Berger and Hahalyak, who confirmed that a settlement had been reached. According to both Kohn and Burnett, the only condition imposed by Berger and Hahalyak was that their clients sign the releases personally. Neither attorney was willing to do so on their clients' behalf, as they feared being sued.

On the morning of June 22, 1984, Burnett flew to Pittsburgh in order to help prepare and sign the settlement documents. The parties met and agreed that Burnett and Kohn would draft the settlement agreement and stipulated dismissals, while Hahalyak would draft the release of certain lis pendens, and Berger would draft the tripartite release. Following their completion, Berger and Hahalyak reviewed all of these documents and with insignificant exceptions, found them acceptable. However, they again stated that they wouldn't sign the documents until their clients did, because they didn't want to be sued. They further stated that they would withdraw as attorneys for any client that didn't sign. Thereafter, the parties informed the Court that they had settled.

Four days later, Kohn received a telephone call from Hahalyak stating that they thought they represented 3½ partnership interests, when in fact they represented four. Thus, the settlement reached on June 22 would have to be renegotiated. Kohn refused, and the motion presently under consideration was subsequently filed. (See affidavit of Kohn attached to Motion to Enforce Settlement, (OCF Contested File "B", Doc. B–47.)

While their testimony largely corroborates that of Kohn and Burnett, Berger

and Hahalyak give a number of reasons why no settlement was ever finalized. First, they both testified that they were never authorized by their clients to settle this case, but only to negotiate. The powers of attorney which their clients had given to them required that the limited partners and their attorneys could not settle their disputes with Patchen Investment and Unit without the written consent of each. They do not deny that they had the oral consent of their clients; indeed, Hahalyak admitted that their clients agreed to the $600,000 figure but were concerned as to how it would be divided. However, no agreement could be finalized without their written consent. Indeed, both stated that they did not even read the settlement documents when it was determined that they were being called upon to sign on behalf of their clients.

They also testified that they never agreed to accept $400,000 cash and the $200,000 promissory note as payment, and that they would never have agreed to accept a note from their opponents. They point to a discrepancy in the payment clauses of the Settlement Agreement (which Kohn and Burnett wrote) and the Tripartite Release (which Berger wrote), noting that paragraphs 4 and 5 of the Settlement Agreement (Exhibit 1 to the Motion to Enforce Settlement Agreement and For Authority to Compromise Claims and Execute Releases, filed June 29, 1984) call for the payment of $400,000 in cash plus a $200,000 promissory note, while paragraph 2 of the Tripartite Release (Ex. 1) calls for the "payment of the sum six hundred thousand ($600,000) Dollars and other valuable consideration ..." While Hahalyak does not deny that he asked Kohn how much interest was due on the note, both Berger and Hahalyak claim that the note was never shown to them and never became a part of the settlement.

As for Kapetan's role in the settlement negotiations, Berger asserted that he played little part in the events of June 21 and 22, and that he did not have authority from Berger or Hahalyak to enter into any agreement.

When asked about the miscalculation in the number of partnership shares held by his clients, Berger stated that he mistakenly thought they represented 3½ rather than 4 shares, and that he did not realize his error until sometime after the June 22 telephone conversation with the Court.

After reviewing all of the evidence in this dispute, we find the assertions of Berger and Hahalyak to be incredible as a matter of fact, and defective as a matter of law.[4] In essence, they would have this Court believe that Kohn and Burnett travelled to Pittsburgh merely to discuss the possibility of a settlement, knowing full well that no final settlement could be achieved until each of the limited partners had signed the documents. Given the bitterness and mistrust which pervades the parties' relationship, we find it inconceivable that Kohn would travel to Pittsburgh unless he was told that opposing counsel had full authority from their clients to settle. We find it equally inconceivable that Berger and Hahalyak would not have known precisely how many partnership units their clients held, since a simple reference to the partnership agreement would have provided this information. It is also difficult to believe that Berger and Hahalyak did not know that the $200,000 promissory note was to be included in the settlement package, particularly in light of Hahalyak's inquiry regarding the amount of interest due on the note. Certainly Kapetan knew that the note was to be included in the package, since he specifically agreed to its inclusion during the June 21 telephone conversation between Kohn and Burnett.

■ While Berger and Hahalyak have attempted to downplay Kapetan's role in the negotiation and formulation of the set-

---

**4.** In deciding this dispute, we find it uunnecessary to engage in a choice of law analysis, since it appears that the same principles of compromise and settlement prevail in Pennsylvania, Ohio and Kentucky. *Cf. Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984).

tlement on their behalf, they did not see fit to produce him as a witness at the July 16 hearing. As a partner in Berger's firm, he was obviously within Berger's control and no adequate explanation for his absence has been offered. Since it certainly would have been in Berger's interest to have him corroborate his version of what transpired, we find ample justification for inferring that Kapetan's testimony would have been unfavorable to Berger and Hahalyak. *O.F. Shearer & Sons v. Cincinnati Marine Service, Inc.*, 279 F.2d 68, 73 (6th Cir.1960); *Scott v. Slater*, 253 S.W.2d 232 (Ky.1952); *Haas v. Kasnot*, 371 Pa. 580, 92 A.2d 171, 173 (1952).

Based upon the parties' testimony, the extensiveness of the settlement negotiations, the care with which the settlement documents were drawn, and the parties' contemporaneous representations to this Court that a full settlement had been reached, we conclude as a matter of fact that an enforceable settlement was consummated on June 22, 1984. This conclusion is buttressed by the fairness of the settlement. The $600,000 which Berger, Hahalyak, and their clients will receive exceeds the amount of their proof of claim by nearly $250,000.

Even if we were to credit their version of the facts, Berger and Hahalyak's assertions stand on no better footing as a matter of law. They have strenuously and repeatedly urged that their capacity to enter into a binding settlement was governed by their powers of attorney, and that the requirement of obtaining the signatures of each of their clients was never met.

 In addressing this argument, we first note the well-established principle that a settlement agreement is binding, regardless of whether it is oral or written. *Kukla v. National Distillers Products Co.*, 483 F.2d 619 (6th Cir.1973); *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*, 298 F.2d 801 (3rd Cir.1962); *Leon Industries, Inc. v. I.C.N. Pharmaceuticals*, 472 F.Supp. 1241 (E.D.Mo.1979). While it is generally true that an attorney may not settle a matter without the express authorization of his client (*e.g., Roth-*

*man v. Fillette*, 503 Pa. 259, 469 A.2d 543 (Pa.1983); *DeLong v. Owsley's Executrix*, 308 Ky. 128, 213 S.W.2d 806 (1948); *but see, Glazer v. J.C. Bradford & Co.*, 616 F.2d 167 (5th Cir.1980)), it is equally true that lingering formalities or technicalities in the execution or drafting of settlement documents will not obstruct the enforcement of an otherwise binding agreement. *Leon Industries, Inc. v. I.C.N. Pharmaceuticals, supra.* Berger and Hahalyak have never asserted that they did not have at least the oral approval of their clients to enter into the settlement embodied in the documents. To the extent that they represent themselves pro se as limited partners, they are hardly in a position to argue that they personally did not agree to the settlement terms on their own behalf. Having obtained oral approval, the requirement of written authorization in the power of attorney can only be considered an inconsequential formality. Indeed, Hahalyak himself viewed it as such during his telephone conversation with the Court on June 22, 1984.

Even if their clients never gave express approval for the settlement, it is clear that they have subsequently ratified it by their silence. Each of the appropriate limited partners and other parties in interest were given notice of the July 16, 1984 hearing. With the exception of Berger and Hahalyak, Mr. Ralph J. Simons was the only limited partner in attendance at that hearing. He testified on the record that Berger and Hahalyak had not kept him fully informed of the events of the preceding four years and that they no longer represented him; that he approved of the settlement, but did not approve of the manner of distribution proposed by Berger and Hahalyak; and that he did not want to receive his share of proceeds through them.

 Given Berger and Hahalyak's equivocal statements as to which of the limited partners they now represent, the Court deemed it prudent to again notify the affected parties of the settlement and pending motion to enforce. The Court made it clear on the record that responses from the parties individually, rather than through counsel, were sought. On July 17, 1984 a notice was sent setting a time for filing

objections to the settlement and requiring attendance at a subsequent hearing by any objectors. The notice clearly stated that silence would be deemed an acceptance of the settlement. (OCF Contested File "B", Doc. B–55).

With the exception of a new flurry of motions and objections from Berger and Hahalyak, only one response to this notice was received. That document consists of a letter from A. Dean Bartlett noting an objection to the settlement on the grounds set forth by Berger and Hahalyak. Neither A. Dean Bartlett nor any of the limited partners (with the exception of Berger and Hahalyak) appeared at the August 8, 1984 hearing.

Given the significant amount of money at stake, the protracted history of this dispute, and the important issues involved, the obligation to appear at the hearing can hardly be deemed unreasonable. By failing to appear, we find that the parties have ratified the settlement. Many courts have made it clear that:

> A client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority ... Indeed, a client makes his attorney's act his own if he does not disavow it the first moment he receives knowledge that his attorney has transcended his authority.
>
> *Yarnall v. Yorkshire Worsted Mills,* 370 Pa. 93, 87 A.2d 192, 193 (1952)

See also, *Appeal of Scott Tp.,* 31 Pa. Commw. 505, 377 A.2d 826, 827 (1977); *Anglo-American Mill Co. v. Kentucky Bank & Trust Co.,* 243 Ky. 124, 47 S.W.2d 951 (1932).

Since there is no indication that A. Dean Bartlett was not informed of the terms of the settlement when it was reached, and there is nothing in the record pointing to their disapproval of those terms, we find that the above-stated principle applies with equal force to the limited partners in question and to A. Dean Bartlett.

■ Berger and Hahalyak's other assertions can be quickly disposed of. Their claim that the miscalculation of the partnership shares constituted a mutual mistake cannot withstand scrutiny, for the simple reason that the mistake, if any, was unilateral, not mutual. We heartily adopt Bankruptcy Judge William A. King's conclusion in *In re Sand N' Surf, Inc.,* 13 B.R. 384, 386 (Bankr.E.D.Pa.1981):

> While this Court fully realizes the urgency under which the plaintiff was acting, we are in no position to rescind valid contracts simply because one party subsequently discovers that it failed to appraise itself of certain available facts which would have affected its decision to enter into that contract. Unilateral mistakes, which arise through no fault of the other party, but simply through the mistaken party's own negligence or want of due care, afford no basis of relief via recission. *Marmon Philadelphia Co. v. Blocksom,* 103 Pa.Super. 542, 157 A. 510 (1931).

See also, *Runyan v. NCR Corp.,* 573 F.Supp. 1454, 1462 (S.D.Ohio, 1983); *Bollinger v. Randall,* 184 Pa.Super. 644, 135 A.2d 802, 805–806 (1957).

■ Berger and Hahalyak claim that the settlement is not valid because it purports to transfer real estate but fails to comply with the statute of frauds. We find no merit to this argument. The settlement agreement merely reflects the limited partners' consent to the transfer of Patchen Place. It does not purport to effectuate the transfer itself.

Finally, Berger and Hahalyak raise the questions of lack of jurisdiction and conflict of interest. Having previously ruled from the bench as to these questions, they require no further comment.

In conclusion, we make the following observations:

■ After sifting through their protests and charges of foul play, the Court is left with the clear conviction that the real source of Berger and Hahalyak's consternation lies not in the settlement package itself, but in the potential conflicts between their clients and themselves in distributing that package. The testimony of Ralph Simons leads us to believe that the settlement became unsatisfactory to Berger and Hahalyak only after they met resistance

from their clients over the amount of fees and expenses they are claiming. This problem (if it truly exists) is of their own making, and may require resolution in another court. In order to prevent Unit and Patchen Investment from becoming embroiled in this potential controversy, the Court hereby ORDERS that the $400,000 in cash be placed in an interest bearing escrow account until further Order of this Court. The proceeds of the promissory note shall be added to this account upon the note's maturity. None of the settlement proceeds shall be released by this Court until such time as either a binding agreement is reached among Berger, Hahalyak, and their clients, or a final order is issued by a court of competent jurisdiction regarding how those funds should be distributed.

For the reasons stated above, the motion to enforce and approve the settlement among the parties is hereby GRANTED in its entirety. The motions to dismiss and for summary judgment filed by Berger and Hahalyak are hereby DENIED. The foregoing shall constitute this Court's findings of fact, opinion and conclusions of law.

IT IS SO ORDERED.