**In re Martin A. STADER, Debtor.**

**Daniel MEISTER, Trustee, Plaintiff,**

**v.**

**CHASE MANHATTAN BANK, N.A., Defendant.**

**Bankruptcy No. 5–80–00134.**
**Adv. No. 5–85–0033.**

United States Bankruptcy Court, D. Connecticut.

Sept. 1, 1988.

Ira B. Charmoy, Charmoy & Kanasky, Bridgeport, Conn., for Chapter 7 Trustee.

Max F. Brunswick, Sherman A. Zitomer, New Haven, Conn., for Chase Manhattan Bank, N.A.

## MEMORANDUM OF DECISION ON TRUSTEE'S OBJECTION TO CLAIM

ALAN H.W. SHIFF, Bankruptcy Judge.

The trustee objects to the claim of Chase Manhattan Bank, N.A. (Chase), asserting that the underlying debt was released by novation.[1]

## BACKGROUND

On February 7, 1980, the debtor (Stader) filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code and listed in Schedule A–3 an unsecured, undisputed debt to Chase in the amount of $537,-524.07. On May 12, 1980, a discharge was granted. On December 19, 1980, Chase instituted an adversary proceeding to revoke Stader's discharge, *see* 11 U.S.C. § 727(d), and thereafter established at trial that Stader had fraudulently concealed valuable real estate from his schedule of assets. As a consequence, Stader's discharge was revoked. *In re Stader*, Adv. No. 5–81–0001 (Bankr.D.Conn. July 21, 1982). On July 25, 1983, Stader amended Schedule A–3 to designate his debt to Chase as "disputed". The disputed debt relates to the following personal guaranties of loans made by Chase to two corporations in which Stader was president and sole shareholder.

On September 5, 1972, Stader executed a guaranty of debts incurred by Stader Asso-

---

1. Generally, in order to be entitled to a distribution from a chapter 7 bankruptcy estate, *see* 11 U.S.C. § 726, a creditor is required to file a proof of claim, *see* 11 U.S.C. § 501(a); Official Form 19, which is deemed allowed unless a party in interest objects, *see* 11 U.S.C. § 502(a). The time within which to file a proof of claim is governed by Rule 3002, but when notice of insufficient assets to pay a dividend has been given to creditors pursuant to Rule 2002(e), creditors need not file their claims unless the clerk notifies them that the payment of a dividend appears possible, *see* Rule 3002(c)(5).

A search of the record reveals that Chase has not filed a proof of claim. This was initially reported as a no asset case. After Stader's discharge was revoked in recognition, *inter alia,* that there were undisclosed assets, *see text infra,* a notice should have been but was not sent to Chase and other creditors under Rule 3002(c)(5).

Neither party has raised this issue. To the contrary, both have treated Chase's claim as though a proof of claim had been filed. This decision recognizes the *de facto* status of Chase's claim.

ciates, Inc. (Stader Associates),[2] the builder and owner of Cross River Plaza, a shopping center in Cross River, New York (Center). On October 16, 1972, Stader executed an identical guaranty of the obligations of Redats, Inc. (Redats),[3] the owner and operator of a restaurant in the Center.

Chase maintains that the personal guaranties were in effect when, on June 3, 1974, Stader, as president of Redats, executed a note for $68,800.00 [4] and when, on December 9, 1974, Stader, as president of Stader Associates, executed a note for $396,156.04.[5] The trustee concedes the validity of the notes, but asserts that the personal guaranties were released by novation.[6]

## DISCUSSION

### I

### Choice of Law

■ The trustee argues that a federal court sitting in Connecticut should apply Connecticut law when resolving matters of contract interpretation. In addressing a choice of laws question, this court previously recognized that "federal courts must apply the substantive conflict of law rules of the forum state in which it sits." *In re U.S. Repeating Arms Co.*, 67 B.R. 990, 994 (Bankr.D.Conn.1986), *citing, Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Connecticut courts give effect to agreements between parties regarding the substantive law to govern the interpretation and enforcement of their contract. *Gannett Co., Inc. v. Register Publishing Company*, 428 F.Supp. 818, 824 (D.Conn.1977), *citing, Pollak v. Danbury Mfg. Co.*, 103 Conn. 553, 131 A. 426 (1925); *Fairfield Lease Corp. v. Pratt*, 6 Conn.Cir. 537, 278 A.2d 154 (1971); *Vending Credit Corp. v. Trudy Toys Co.*, 5

Conn.Cir. 629, 260 A.2d 135 (1969). Paragraph 5 of each guaranty provides, *inter alia*, that "obligations and liabilities arising hereunder shall be construed according to the laws of the State of New York." [7] I therefore conclude that New York law controls Stader's liability under those guaranties.

### II

### Novation

Under New York law, in order to establish a novation, each of the following four elements must be present: (1) a valid prior obligation; (2) the agreement of all parties to a new contract; (3) the extinguishment of the old obligation; and (4) a valid new contract supported by consideration. *Callanan Industries v. Micheli Contracting*, 124 A.D.2d 960, 508 N.Y.S.2d 711, 712, (3d Dept.1986); *Wasserstrom v. Interstate Litho Corp.*, 114 A.D.2d 952, 495 N.Y.S.2d 217, 219 (2d Dept.1985); *Town & Country Linoleum & Carpet Co. v. Welch*, 56 A.D. 2d 708, 392 N.Y.S.2d 517, 518 (4th Dept. 1977); *see also, French American Banking Corp. v. Flota Mercante*, 609 F.Supp. 1352, 1357 (S.D.N.Y.1985); *VJK Productions v. Friedman/Meyer Productions*, 565 F.Supp. 916, 921 (S.D.N.Y.1983). As to the fourth element, the discharge of the original contract ordinarily constitutes sufficient consideration for the substituted contract. *Wasserstrom, supra*, 495 N.Y. S.2d at 219.

Under non-bankruptcy law, the party asserting a claim of novation has the burden of establishing the "clear and definite intention on the part of all concerned that such is the purpose of the agreement." *Beck v. Manufacturers Hanover Trust Co.*, 125 Misc.2d 771, 481 N.Y.S.2d 211, 218 (Sup.Ct.1984) (*quoting* 22 N.Y.Jur.2d, *Contracts*, § 406, pp. 321–322); *see also* 58

---

**2.** Claimant's Exhibit 3.

**3.** Claimant's Exhibit 1.

**4.** Claimant's Exhibit 2.

**5.** Claimant's Exhibit 4.

**6.** The trustee also claimed a recoupment which was denied by the July 28, 1985 partial summa-

ry judgment entered in favor of Chase. Thereafter, on July 22, 1987, during the course of the extended hearing held on this matter, the trustee filed an Amended Substituted Objection to Claim.

**7.** Claimant's Exhibits 1 and 3.

Am.Jur.2d *Novation* § 32 (1971). However, that burden does not require proof of an express novation. A novation may be implied or inferred from all surrounding circumstances. *National Equipment Rental, Ltd. v. Sebert Mfg. Corp.*, 42 Misc.2d 415, 248 N.Y.S.2d 374, 376 (Sup.Ct. 1964); *French American Banking Corp., supra*, 609 F.Supp. at 1358. That procedure will apply here because it comports with the assignment of burdens of proof in bankruptcy claims litigation. Generally, "[a] properly filed proof of claim 'constitute[s] prima facie evidence of the validity and amount of the claim.' Consequently, a debtor or trustee who objects to a proof of claim has the burden of going forward with evidence in rebuttal. The ultimate burden of persuasion, however, is upon the creditor, and in that regard, the creditor must prove his claim by a fair preponderance of the evidence." *In re Central Rubber Products, Inc.*, 31 B.R. 865, 867 (Bankr.D. Conn.1983) (citations omitted); *see also, Matter of Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir.1988). Here, the trustee's objection is based upon novation. If he succeeds, Chase will have no claim to prove; if he doesn't, the claim will be allowed.

### a.
### The Redats Note

■■■ The trustee contends that Chase orally agreed to release Stader from his guaranty of the Redats note if Stader found someone acceptable to Chase to replace him as operator of the restaurant. The trustee bases his contention on Stader's uncontroverted[8] testimony that the following events led to the novation of the Redats guaranty.

Redats initially borrowed money from Chase in 1972.[9] At that time, Chase required Stader to sign a hypothecation agreement, pledging certain personal savings passbooks as collateral.[10] Following the closing of the restaurant in May, 1973, Stader was advised by Paul Dallak, a manager and assistant treasurer at Chase's Cross River branch,[11] that his personal guaranty would be released if he produced "a viable tenant who would assume the operation of the restaurant or take it over in a form acceptable to the bank...."[12] In September or October 1973, Stader introduced John Lium to Dallak as a person interested in taking over the restaurant and the Center.[13] Dallak referred the matter to Charles Schroeder, a Chase vice-president, who had the authority to enter into such negotiations.[14] Lium and Stader met with Schroeder in late September or early October 1973.[15] In March 1974, Dallak informed Stader that Lium had been approved by Schroeder to take over the restaurant and "if Lium is going to take over the notes, you will be relieved of your guarantee."[16] In June or July 1974, Dallak told Stader that the passbooks would be returned, "and then the guarantee would be cancelled [or] released. ..."[17] Thereafter, Stader's passbooks and hypothecation agreements were returned, and Lium eventually assumed control of the restaurant.[18]

---

8. Chase contends that the trustee's failure to call John Lium (the party who assumed management of the restaurant) as a witness supports an inference that Lium's testimony would have been unfavorable to the trustee's theory of novation. Under federal law, in order to support such an inference, Chase was required to show that the trustee's control over Lium was such that he was able to assure Lium's appearance at trial, or that Lium was available to testify and subject to subpoena. *Matter of Unit, Inc.*, 45 B.R. 425, 431–32 (Bankr.S.D.Ohio 1984); *Matter of Pal Transport, Inc.*, 13 B.R. 935, 939 (Bankr. M.D.Fla.1981). No such showing has been made here.

9. Tr., September 23, 1986, Vol. I at 4.

10. *Id.* at 4–5; Trustee's Exhibit A and H.

11. Tr., September 23, 1986, Vol. I at 4.

12. *Id.* at 10–12.

13. *Id.* at 13.

14. *Id.* at 14.

15. *Id.* at 15.

16. *Id.* at 16–17.

17. *Id.* at 17–18.

18. *Id.* at 13, 16 and 18.

Stader's testimony was bolstered by his August 4, 1974 letter [19] to Dallak:

> It is my understanding since the restaurant is closed, Redats, Inc. is no longer functioning, the Hypothecation agreements have been returned and lium in [sic] assuming the control and responsibilities [sic] of Redats that I am neither corporately or psersonally [sic] responsible for any existing debts.

An April 15, 1976 letter is to the same effect.[20] In that letter, Stader responded to a demand by Chase for the repayment of the Redats note by reminding Chase of the agreement reached by him, Lium and Schroeder, and questioning why the bank had waited almost two years to communicate with him if it "believed that I was personally responsible."[21]

I find that Stader's testimony is credible and convincing. Moreover, Chase's own records support Stader's account of the novation. In an April 29, 1974 file memo, Schroeder wrote that "the Redats loan ... has since been assumed by the Hungry Lion Restaurant, who [sic] leased the restaurant space from Stader."[22] I am accordingly persuaded that Chase and Stader entered into negotiations which culminated in Chase's approval of Lium to operate the restaurant and assume its obligations and resulted in a concomitant release of Stader from his personal guaranty.

b.

*Stader Associates Note*

■ The trustee contends that Chase orally agreed to relieve Stader from his guaranty of the Stader Associates note if Stader would turn over management of the Center to Chase. The trustee's contention is based upon Stader's testimony corrobo-

rated by Frederick Jambes, his friend and advisor.

Stader testified that after the Redats novation, he asked Dallak about the possibility of obtaining a release on the Stader Associates guaranty. Dallak stated that he would confer with Schroeder, who thereafter proposed that Chase lend Stader Associates $60,000.00 to pay certain liens on the Center in return for Stader Associates' execution of a new secured note in the amount of its total outstanding balance guaranteed by Stader. Stader testified that he did not accept that proposal because it did not relieve him of his personal liability, and that he telephoned Schroeder to request an arrangement similar to the Redats novation.[23] In response, Schroeder arranged for a meeting with Stader sometime in late October or early November 1974.[24] At that meeting, Stader, accompanied by Jambes, reasserted his position that Schroeder's proposal was unacceptable because it failed to release his personal guaranty.[25] According to Stader, Chase then proposed that it assume management of the Center and offered to release his guaranty provided that he executed the following documents on behalf of Stader Associates: a new note, a second mortgage to secure the new note, and a confession of judgment in the amount of the old note. In addition, Stader was to personally execute irrevocable stock powers in favor of Chase.[26]

On November 19, 1974, Stader executed the confession of judgment.[27] On December 9, 1974, Stader signed a $396,156.04 note[28] and mortgage[29] and a blank form captioned "Irrevocable Stock/Bond Pow-

19. Trustee's Exhibit D.

20. Trustee's Exhibit E.

21. *Id.*

22. Trustee's Exhibit B. At this time, the novation of the Stader Associates guaranty had not yet occurred and Stader was still managing the Center.

23. Tr, September 23, 1986, Vol. I at 26–29; Trustee's Exhibit F.

24. Tr., September 23, 1986, Vol. I at 30; Vol. II at 23.

25. Tr., September 23, 1986, Vol. I at 30–32.

26. *Id.* at 32–33.

27. Trustee's Exhibit N.

28. Claimant's Exhibit 4.

29. Trustee's Exhibit M.

er".[30] Stader testified that as of December 9, 1974, he had no management role; he did, however, retain title to the Center.[31] Chase opened a collateral account for the receipt of rents [32] and had Stader sign letters on Chase's stationary, informing tenants that Chase was assuming management of the Center and would be collecting the rents.[33] Stader thereafter referred any communication from tenants to Chase.[34] The only further involvement Stader had with the Center occurred in August 1975 when he attempted to regain control after receiving notice of foreclosure by the holder of the first mortgage.[35]

Chase attempted to rebut Stader's testimony by the introduction of various memoranda from its files in which Chase officers referred to the guaranty as late as August 1975. Those references are, however, merely the mistaken impression by those officers of the consequence which followed from Stader's execution of the note, mortgage, confession of judgment and irrevocable stock powers.

Jambes' testimony corroborates Stader's account of Chase's offer of novation. Jambes testified that he accompanied Stader to a meeting with Chase.[36] According to Jambes, Stader was asked "to release everything to them, mortgages and papers and all kinds of documents ..." [37] in return for which Chase would "consider the property as a guaranty and [would] remove [the] ... personal guaranty." [38]

Having reviewed the documents and assessed the credibility of the witnesses, I am convinced that Stader would not have executed a new note, mortgage, confession of judgment and irrevocable stock powers without a concomitant release of his guaranty. Accordingly, I conclude that Stader's guaranty of the Stader Associates note was extinguished by novation.

## CONCLUSION

For the foregoing reasons, the trustee's objection to Chase's claim is sustained and judgment shall accordingly enter in his favor.

---

**30.** Trustee's Exhibit K; Tr., September 23, 1986, Vol. I at 37–38.

**31.** *Id.* at 40.

**32.** *Id.* at 42.

**33.** Trustee's Exhibit 25.

**34.** Tr., September 23, 1986, Vol. I at 57.

**35.** *Id.* at 42–43.

**36.** Tr., September 24, 1986, Vol. III at 8.

